The TOWN OF HUNTINGTON, the County of Suffolk, the County of Nassau, the Town of North Hempstead, the Town of Oyster Bay, and Robert J. Mrazek, Plaintiffs–Appellees,

v.

John O. MARSH, Jr., Secretary of the U.S. Army, Lt. General Joseph K. Brattan, Chief of the Corps of Engineers, Colonel C.E. Edgar III, District Engineer, Army Corps of Engineers, New England Division, and Department of the Army Corps of Engineers of the United States of America, Defendants–Appellants.

No. 1196, Docket 89–6039.

United States Court of Appeals, Second Circuit.

Argued June 23, 1989.

Decided Aug. 14, 1989.

Robin L. Greenwald, Asst. U.S. Atty., E.D., Brooklyn, N.Y. (Andrew J. Maloney, U.S. Atty., E.D.N.Y., Robert L. Begleiter, Asst. U.S. Atty., E.D.N.Y., Brooklyn, N.Y., of counsel), for defendants-appellants.

Joseph D. Pizzurro, New York City (Arlene Lindsay, Town Atty., Town of Huntington, Huntington, N.Y., Daniel Martin, John P. Campbell, Peter K. Vigeland, Peter Sullivan, Curtis, Mallet–Prevost, Colt & Mosle, New York City, of counsel), for plaintiffs-appellees.

Eric Lukingbeal, Hartford, Conn. (Dwight H. Merriam, Duncan Ross Mackay, Robinson & Cole, Hartford, Conn., of counsel), for amici curiae The Connecticut Marine Trades Ass'n and The New York Marine Trades Ass'n.

Before MESKILL, PIERCE and MAHONEY, Circuit Judges.

MAHONEY, Circuit Judge:

This is an appeal from a judgment of the United States District Court for the Eastern District of New York, Jacob Mishler, Judge, enjoining defendants-appellants, John O. Marsh, Jr., Secretary of the U.S. Army, Lt. General Joseph K. Bratton, Chief of the Corps of Engineers, Colonel C.E. Edgar, III, District Engineer, Army Corps of Engineers, New England Division, and the Department of Army Corps of Engineers of the United States of America (collectively the "Corps") from dumping dredged materials, or issuing permits to dump dredged materials, at a disposal site designated Western Long Island Sound III ("WLIS III") located in the Long Island Sound (the "Sound") off Huntington, New York. The Corps contends that the permanent injunction was erroneously entered by the district court in behalf of the plaintiffs-appellees, the Town of Huntington, County of Suffolk, County of Nassau, Town of North Hempstead, Town of Oyster Bay and Robert J. Mrazek (collectively "Huntington"), because the district court failed to balance the equities between the parties and conduct an evidentiary hearing as required by our prior decision in *Town of Huntington v. Marsh*, 859 F.2d 1134 (2d Cir.1988) ("*Huntington I*"), familiarity with which is assumed.

In *Huntington I*, we affirmed the district court's grant of Huntington's motion for summary judgment and denial of the Corps' cross-motion for summary judgment, concluding that: (1) the Marine Protection, Research, and Sanctuaries Act of 1972, 33 U.S.C.A. §§ 1401–1445 (1986 & West Supp.1989) ("Ocean Dumping Act") applied to the initial designation of WLIS III as a disposal site; and (2) the environmental impact statement ("EIS") issued by the Corps for its designation of WLIS III as a dumpsite violated (a) the Ocean Dumping Act because it failed to consider the Act's criteria for the designation of such sites, and (b) the National Environmental Policy Act of 1969 ("NEPA"), 42 U.S.C. §§ 4321–4375 (1982 & Supp. V 1987), because it failed to consider the types, quantities and cumulative effects of the dredged material which would be deposited at WLIS III.

In *Huntington I*, however, we vacated a permanent injunction issued by the district court, identical to the permanent injunction before us on this appeal, because "neither the opinion [underlying the injunction] nor the order [imposing it] addressed the appropriateness of an injunction on the facts of this case," and remanded "for the purpose of making such a determination, to be guided by traditional equitable principles." 859 F.2d at 1143.

On remand, the district court again imposed an injunction identical in terms to the previously vacated injunction, without holding an evidentiary hearing, finding that "[t]he public has an interest in maintaining the physical, chemical and biological balance at the dump site that outweighs the private interest," described as "inconvenience and additional cost to owners of docks and piers." The Corps again appeals the determination of the district court.

We vacate and remand.

*Background*

The facts underlying this litigation are comprehensively stated in *Huntington I*, and that statement is incorporated by reference here. Briefly, in the fall of 1980, certain owners and operators of marinas in Mamaroneck Harbor, New York (the "Applicants"), located on the Sound, requested permits to conduct dredging operations on

their properties and dispose of the dredged material at an ocean dumpsite, seeking to avail themselves of the economies arising from scheduled dredging of federal waterways in the area by the Corps and the resulting presence of dredging contractors. On March 23, 1981, the Applicants modified their application to allow disposal of their waste at "the closest available site" in the Sound, which was the Central Long Island Sound dumpsite ("CLIS") located off New Haven, Connecticut; that application was granted. On September 1, 1981, they again requested a modification to allow dumping further west in the Sound. Since there were no operative dumpsites west of CLIS in the Sound at the time, the Corps was required to designate a new dumpsite, which turned out to be WLIS III.

This designation was a "major federal action" requiring an EIS under NEPA. *See* 42 U.S.C. § 4332(2)(C) (1982). A final EIS was issued on February 12, 1982, and the Corps designated WLIS III on March 16, 1982. Huntington promptly initiated this litigation. Pursuant to permit applications granted by the Corps, dumping at WLIS III was conducted from the designation of the site until the entry of the initial injunction in this action on March 22, 1988, and thereafter until June 1, 1988, as authorized by a stay of that injunction entered by the district court upon application of the Corps. Under the original designation, dumping has never been allowed at WLIS III from June 1 to September 30 of any year, and no alteration of that arrangement is apparently contemplated by any party to this action.

No dumping has been conducted at WLIS III since June 1, 1988. The original injunction entered by the district court precluded the resumption of dumping after September 30, 1988, and the injunction entered after the remand in *Huntington I* (combined with a prior temporary restraining order) precluded it thereafter. The Corps contends that it has monitored the impact of the dumping that occurred at WLIS III from March, 1982 to June, 1988 (1) by reviewing applications for permits to dump at that site for, *inter alia*, their cumulative effect on the site; and (2) pursuant to an ongoing Disposal Area Monitoring System ("DAMOS") program established by the Corps in 1977, under which it monitors open water disposal sites for physical, chemical and biological effects of disposing of dredged materials. A DAMOS survey of WLIS III conducted in August and October, 1985 establishes, according to the Corps, that the dumping conducted at WLIS III has not had any adverse environmental impact.

As indicated earlier herein, upon remand in *Huntington I*, the district court imposed a permanent injunction identical to the prior injunction vacated in *Huntington I*, after oral argument but without any evidentiary hearing, stating:

> The Congress designated the WLIS III site as an ocean dumping site to give assurance that the physical chemical and biological balance in those waters would be maintained. The requirement of FEIS under ODA, NEPA and its regulations was for the purpose of giving the public adequate time and opportunity to investigate and argue the effects of the dumping of dredged spoils. We do not accept the opinion of the Corps as a substitute for Congressional mandate. We believe that absent an injunction prohibiting the dumping, the Corps will engage in the practice of issuing permits for the illegal use of the site.
>
> The resulting effect of the issuance of an injunction is the inconvenience and additional cost to owners of docks and piers. The public has an interest in maintaining the physical, chemical and biological balance at the dump site that outweighs the private interest.
>
> \*　　\*　　\*　　\*　　\*　　\*
>
> In balancing the competing claims and the effect the granting or withholding of the injunctive relief would have on the parties, we find that the plaintiffs have established irreparable damage and the right to the injunctive relief as set forth in the Permanent Injunction Judgment dated March 22, 1988.

(Footnote and citations omitted.)

This appeal followed. At the oral argument of the appeal, counsel for the Corps

stated that the data compilation and report review for the new EIS under preparation by the Corps pursuant to court order would be completed by August 15, 1989, and the proposed EIS would be released for a forty-five day public comment period on October 16, 1989. Final issuance of an EIS would follow thereafter, the timing dependent upon the nature and complexity of the public comments and resulting action by the Corps. The outstanding injunction provides that "[t]he court retains jurisdiction over this matter and grants defendants the opportunity to comply with the pertinent statutes and regulations and seek modification of this judgment."

Counsel for Huntington contended at oral argument that the violation of NEPA resulting from issuance of a defective EIS establishes irreparable injury, to be balanced "on a particularized basis in each case against the competing equities." He conceded, however, that Huntington did "not contest" the Corps' assertion that it had conducted ongoing studies of WLIS III which "indicate a lack of environmental damage" from the dumping that has occurred at that site.

### Discussion

The issues concerning the Corps' violation of the Ocean Dumping Act and NEPA in connection with its initial designation of WLIS III were both resolved in favor of Huntington in *Huntington I.* The only issue to be resolved on this appeal is whether the injunction issued upon remand was properly entered.

As we recognized in *Huntington I,* provision is made for injunctive relief in the Ocean Dumping Act, 33 U.S.C. § 1415(g)(1) (1982). 859 F.2d at 1143. We further recognized that injunctive relief has been used when appropriate for violations of NEPA. *Id., Natural Resources Defense Council v. Callaway,* 524 F.2d 79, 94–95 (2d Cir.1975). We also noted, however, that injunctive relief does not follow automatically upon a finding of statutory violations, including environmental violations. 859 F.2d at 1143. "On the contrary, '[a]n injunction should issue only where the intervention of a court

of equity is essential in order effectually to protect property rights against injuries otherwise irremediable.' " *Id.* (quoting *Weinberger v. Romero–Barcelo,* 456 U.S. 305, 312, 102 S.Ct. 1798, 1803, 72 L.Ed.2d 91 (1982) (quoting *Cavanaugh v. Looney,* 248 U.S. 453, 456, 39 S.Ct. 142, 143, 63 L.Ed. 354 (1919))); *see also Amoco Prod. Co. v. Village of Gambell,* 480 U.S. 531, 542–45, 107 S.Ct. 1396, 1402–04, 94 L.Ed.2d 542 (1987) (preliminary injunction).

The Supreme Court has repeatedly held that the basis for injunctive relief is irreparable injury and the inadequacy of legal remedies. *Amoco Prod. Co.,* 480 U.S. at 542, 107 S.Ct. at 1402; *Weinberger,* 456 U.S. at 312, 102 S.Ct. at 1803; *Rondeau v. Mosinee Paper Corp.,* 422 U.S. 49, 61, 95 S.Ct. 2069, 2077, 45 L.Ed.2d 12 (1975); *Sampson v. Murray,* 415 U.S. 61, 88, 94 S.Ct. 937, 951, 39 L.Ed.2d 166 (1974); *Beacon Theaters, Inc. v. Westover,* 359 U.S. 500, 506–07, 79 S.Ct. 948, 954, 3 L.Ed.2d 988 (1959); *see also Hecht Co. v. Bowles,* 321 U.S. 321, 329, 64 S.Ct. 587, 591, 88 L.Ed. 754 (1944) (essence of equity jurisdiction is power of chancellor to do equity and mould decree to necessities of particular case).

In applying these general equitable standards for the issuance of injunctions in the area of environmental statutes, the Supreme Court has explicitly rejected the notion that an injunction follows as a matter of course upon a finding of statutory violation. In *Weinberger,* for example, the United States Navy had conducted training activities in and around the Island of Vieques, a municipality of the Commonwealth of Puerto Rico, in the course of which it discharged ordnance into the adjacent waters. The Governor of Puerto Rico and others sued, alleging violation, *inter alia,* of (1) the Federal Water Pollution Control Act ("FWPCA") by failing to obtain a permit from the Environmental Protection Agency ("EPA") with respect to the discharge of ordnance; (2) an executive order relating to listing of sites in the National Register of Historic Places; and (3) NEPA by failing to file an EIS with respect to the training activities at Vieques. The district court agreed that these violations had oc-

curred, and ordered that they be cured "with all deliberate speed," but refused to grant broader injunctive relief upon finding that the training activities were not causing any appreciable harm to the Vieques ecology and were essential to the national defense. *Romero–Barcelo v. Brown,* 478 F.Supp. 646, 705–08 (D.P.R.1979), *rev'd,* 643 F.2d 835 (1st Cir.1981), *rev'd sub. nom. Weinberger v. Romero–Barcelo,* 456 U.S. 305, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982).

On appeal, the First Circuit Court of Appeals determined that the injunction was properly limited with respect to the historic places issue, and that the Navy had filed the required EIS, mooting that issue. 643 F.2d at 862. On the FWPCA issue, however, the circuit court vacated and remanded with the direction that the Navy be enjoined from discharging ordnance into the coastal waters of Vieques until such time as a permit was obtained, *Id.* at 862, stating: "Whether or not the Navy's activities in fact harm the coastal waters, it has an absolute statutory obligation to stop any discharges of pollutants until the permit procedure has been followed and the Administrator of the Environmental Protection Agency, upon review of the evidence, has granted a permit." *Id.* at 861.

In reversing, the Supreme Court registered its flat disagreement with the First Circuit's ruling. The Court said:

> The integrity of the Nation's waters, however, not the permit process, is the purpose of the FWPCA. As Congress explained, the objective of the FWPCA is to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a).
>
> This purpose is to be achieved by compliance with the Act, including compliance with the permit requirements. Here, however, the discharge of ordnance had not polluted the waters, and, although the District Court declined to enjoin the discharges, it neither ignored the statutory violation nor undercut the purpose and function of the permit sys-

tem. The court ordered the Navy to apply for a permit. It temporarily, not permanently, allowed the Navy to continue its activities without a permit.

456 U.S. at 314–15, 102 S.Ct. at 1804.

Similarly, in *Amoco Prod. Co.,* the Ninth Circuit Court of Appeals determined that the Secretary of the Interior had failed to comply with provisions of the Alaska National Interest Lands Conservation Act ("ANILCA") and directed the entry of a preliminary injunction enjoining certain oil and gas lease activity by the Secretary pending the outcome of the litigation. *People of Village of Gambell v. Hodel,* 774 F.2d 1414 (9th Cir.1985), *rev'd sub. nom. Amoco Prod. Co. v. Village of Gambell,* 480 U.S. 531, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987). In doing so, the circuit court held that " '[i]rreparable damage is presumed when an agency fails to evaluate thoroughly the environmental impact of a proposed action,' " and " '[o]nly in a rare circumstance may a court refuse to issue an injunction when it finds a NEPA violation.' " 774 F.2d at 1423 (quoting *Save our Ecosystems v. Clark,* 747 F.2d 1240, 1250 (9th Cir.1984)).

The Supreme Court again reversed, specifically repudiating the quoted formulation as "contrary to traditional equitable principles and [having] no basis in ANILCA." 480 U.S. at 545, 107 S.Ct. at 1404. The Court further stated:

> [T]he environment can be fully protected without this presumption. Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.,* irreparable. If such injury is *sufficiently likely,* therefore, the balance of harms will usually favor the issuance of an injunction to protect the environment. Here, however, injury to subsistence resources from exploration was *not at all probable.*

*Id.* (emphasis added).

The teaching of these cases seems clear, and is echoed by rulings in this circuit.[1] In

---

1. The First Circuit, in *Sierra Club v. Marsh,* 872 F.2d 497 (1st Cir.1989), expressed the view that because NEPA is a purely procedural statute,

and because *Weinberger,* applying FWPCA, and *Amoco Prod. Co.,* applying ANILCA, dealt with statutes that embody substantive standards,

*New York v. Nuclear Regulatory Comm'n,* 550 F.2d 745 (2d Cir.1977), for example, we reviewed our rulings on the precise issue before this court, as follows:

It is true ... that appellant has pointed out cases which do appear to support appellant's position that any NEPA violation constitutes, per se, irreparable harm so as to require the issuance of preliminary injunctive relief, ... but, as appellees correctly assert, the law in this circuit is clear on this issue and directly contrary to the position appellant would have us adopt. In *Conservation Society of Southern Vermont, Inc. v. Secretary of Transportation,* 508 F.2d 927 (2d Cir. 1974), *vacated on other grounds and remanded,* 423 U.S. 809, 96 S.Ct. 19, 46 L.Ed.2d 29 (1975), we were confronted with the precise argument appellant advances here and we responded as follows:

Although the procedural requirements of NEPA must be followed scrupulously and cost or delay will not alone justify noncompliance with the Act, where the equities require, it remains within the sound discretion of a district court to decline an injunction, even where deviations from prescribed NEPA procedures have occurred.

508 F.2d at 933–934 (footnotes omitted). This stance has been reaffirmed in *The East 63rd Street Association v. Coleman,* Docket No. 76–6083, at 3 (2d Cir., May 18, 1976) (order) [*see* 538 F.2d 309], in which we explained: "We also note that even if there were violations of the National Environmental Policy Act, which we by no means find, the district court has substantial discretion to determine whether an injunction should is-

sue." *See Greene County Planning Board v. Federal Power Commission,* 455 F.2d 412, 424–25 (2d Cir.), *cert. denied,* 409 U.S. 849, 93 S.Ct. 56, 34 L.Ed.2d 90 (1972).

*Id.* at 753–54 (some citations omitted).

■ Broader injunctive relief is appropriate, of course, where substantial danger to the environment, in addition to a violation of procedural requirements, is established. In *Natural Resources Defense Council v. Callaway,* 524 F.2d 79 (2d Cir.1975), for example, we directed the entry of a preliminary injunction prohibiting the Navy from continued dumping at a dumpsite off New London, Connecticut in the Sound, *id.* at 94–95. We found a threat of irreparable injury where substantial evidence was presented that contaminated material which the Navy proposed to deposit at that site "would eventually break up and disperse to the northwest where it would contaminate and destroy the first nurseries and marine resources on the coast," *id.* at 82. But a threat of irreparable injury must be proved, not assumed, and may not be postulated *eo ipso* on the basis of procedural violations of NEPA.

This especially concerns us on the record presented in this case. The Corps contends that it has monitored the dumping that occurred at WLIS III for more than six years, in connection with both the permits issued for dumping at that site and its DAMOS program to monitor such sites, and that no injury to the environment has occurred or is threatened as a result of the operation of WLIS III. At oral argument of this appeal, Huntington's counsel, upon specific inquiry, stated that Huntington did "not contest" this assertion.

*Weinberger* and *Amoco Prod. Co.* should not routinely govern decisions in NEPA cases. That is, irreparable harm is more likely to occur if the regulated activity goes forward concurrently with the NEPA process, because interests and expectations favoring the activity will harden as the NEPA process continues, and there is no statutory mandate other than to complete the process. In the case of statutes like FWPCA and ANILCA, on the other hand, there is a substantive standard against which the regulated activity will ultimately be subjected to meaningful

measurement, even if it is allowed to continue *pendente lite. See Sierra Club,* 872 F.2d 502–03.

Whatever the merits of this analysis, its application would not lead to a different result here. In addition to the process mandated by NEPA, *see* 42 U.S.C. § 4322(2)(c) (1982), this case is governed, as *Huntington I* held, by the substantive standards set by the Ocean Dumping Act, *see* 33 U.S.C. § 1413(a) (1982). *Weinberger* and *Amoco Prod. Co.* would accordingly control here under the *Sierra Club* analysis.

We do not regard this colloquy as binding upon Huntington, and we note that Huntington introduced some evidence below of actual damage at the site. That evidence, however, was simply an assertion by a Huntington consultant in an affidavit that samples of materials from five Sound harbors, listed in the initial EIS as harbors that would utilize WLIS III for dredged material disposal, revealed sediments which, *if dumped at WLIS III*, would degrade the environment. The Corps maintains, on the other hand, that it does not allow dumping at WLIS III of sediments of the type specified by Huntington as potentially injurious to the environment.

█ The Corps also contends that interest other than "inconvenience and additional cost to owners of docks and piers," such as benefit to the State of Connecticut and its coastal zone management plan and increased safety of navigation for boats entering and exiting harbors in the Sound, weigh in favor of the continued operation of WLIS III pending the issuance of a valid EIS. It is not the function of this court to resolve these factual contentions. We review them only to indicate the nature of the considerations which the district court should address upon remand in determining whether any further injunction of dumping at WLIS III should issue in this action.

We do not regard the proceedings in the district court following the remand in *Huntington I* as consistent with these standards. The Corps sought an evidentiary hearing "to determine the appropriateness of injunctive relief here," but no such hearing was held. More decisively, the district court appears to have ruled that the establishment of a statutory violation, without more, warranted an injunction. The court determined that the public interest "in maintaining the physical, chemical and biological balance at the dumpsite" outweighed the competing private interest, defined as "inconvenience and additional cost to owners of docks and piers," resulting in a determination that "plaintiffs have established irreparable damage." No consideration was given, however, to the question

whether plaintiff had met its burden to establish some actual or threatened injury to "the physical, chemical and biological balance at the dump site," as distinguished from the Corps' conceded failure to generate a proper EIS before its initial designation of WLIS III.

This is the inquiry to be pursued at an evidentiary hearing upon remand. Plaintiffs, of course, will bear the burden of establishing irreparable injury, *see Corenco Corp. v. Schiavone & Sons, Inc.*, 362 F.Supp. 939, 944 (S.D.N.Y.), *aff'd*, 488 F.2d 207 (2d Cir.1973); *United States v. Gilman*, 341 F.Supp. 891, 907 (S.D.N.Y.1972), and the court should consider and balance all the equities and interests presented for its determination. *Weinberger*, 456 U.S. at 311–13, 102 S.Ct. at 1802–03 (collecting cases).

Finally, we note the representations made by the Corps at oral argument concerning the timetable for generating an EIS, and trust that this effort will be pursued expeditiously. We have no reason to doubt the Corps' *bona fides* in this regard, but simply note that this factor has a bearing on the overall equities which the district court must consider. *Cf. Weinberger*, 456 U.S. at 320, 102 S.Ct. at 1807 (should it become clear that compliance with environmental statute not forthcoming, court should reconsider balance of equities it has struck).

### Conclusion

The judgment of permanent injunction is vacated and the case remanded for further proceedings consistent with this opinion. The mandate shall issue forthwith.