Jeffrey W. **ELLIOTT** and Preserve Appalachian Wilderness, Plaintiffs,

v.

The **UNITED STATES FISH AND WILDLIFE SERVICE** and Ronald E. Lambertson, in his capacity as Regional Director of the U.S. Fish and Wildlife Service, Defendants.

Civ. A. No. 90–263.

United States District Court, D. Vermont.

Oct. 2, 1990.

Cindy Hill Couture, Couture and Hill, Northampton, Mass., James Dumont, Middlebury, Vt., for plaintiffs.

Helen Toor, Asst. U.S. Atty., Burlington, Vt., Abner Cooper, U.S. Dept. of Interior, Newton Corner, Mass., Carl G. Dworkin, Albany, N.Y., for defendants.

## FINDINGS OF FACT AND OPINION

PARKER, District Judge.

Plaintiffs moved for a temporary restraining order and preliminary injunction to enjoin the United States Fish and Wildlife Service from introducing chemical lampricides into Lewis Creek, a stream feeding into the Vermont side of Lake Champlain, on September 23, 1990. A hearing was

held and evidence was submitted on the motions on September 21 and 22, 1990. At the conclusion of the hearing, the Court denied plaintiffs' motions from the bench and by written order entered on September 22, 1990. The following findings of fact and conclusions of law supplement the Court's September 22 order.

## I. FINDINGS OF FACT

1. The United States Fish and Wildlife Service and the New York State Department of Environmental Conservation, in cooperation with the Vermont Department of Fish and Wildlife, have initiated an eight-year program designed to reduce the population of sea lampreys in Lake Champlain. The sea lamprey is a species of parasitic fish that preys on fishes valued by the sports fishing industry. The program includes the controlled release of two chemicals—TFM and Bayer 73, designated "lampricides"—into streams and deltas flowing into Lake Champlain, where the sea lamprey larvae, or ammocoetes, develop. Final Environmental Impact Statement: Use of Lampricides in a Temporary Program of Sea Lamprey Control in Lake Champlain with an Assessment of Effects on Certain Fish Populations and Sportfisheries (July 19, 1990) (Government Exhibit B) (hereafter FEIS), at 1.

2. As required by the National Environmental Policy Act (NEPA), 42 U.S.C. § 4332(2)(C), and its regulations, 40 CFR Part 1505, the U.S. Fish and Wildlife Service prepared draft and final Environmental Impact Statements for the lampricide project. The draft statement (DEIS) was released for public review in November 1987. The comment period on the DEIS ended December 1, 1989. The FEIS was made available for public comment in August 1990. On September 11, 1990, the Fish and Wildlife Service issued its "Record of Decision" on the program. Record of Decision (Government Exhibit D), at 6, 16.

3. Permits for the lampricide treatments were issued by the New York Department of Environmental Conservation, the Adirondack Park Agency and the Ver-

mont Agency of Natural Resources. *Id.* at 6.

4. The U.S. Fish and Wildlife Service identified a primary purpose of the program as follows:

Achieve maximum practical short-term reduction of parasitic phase sea lamprey via 2 applications of chemical lampricides to 13 tributaries and 5 delta areas. The first application would include all significant lamprey producing tributary and delta areas. Timing and scope of the second application would be based on post treatment ammocoete recovery surveys but would be planned to occur 4 years after the first treatment, and would likely be as extensive.

*Id.* at 6–7. Other aspects of the overall program include stocking the lake with trout, steelhead and salmon, and assessing economic and environmental impacts. *Id.* at 7.

5. The program calls for eventual release of TFM (3–trifluoromethyl–4–nitrophenol) in portions of nine New York streams, three Vermont streams and the Poultney River, shared by both states as an interstate boundary. Six New York streams and one Vermont stream, Lewis Creek, are slated for treatment in September 1990. One Vermont stream initially recommended for TFM treatment, Indian Brook, will not receive lampricides in order to protect the northern brook lamprey, a threatened species inhabiting that stream. Delta areas in New York waters of Lake Champlain are scheduled for treatment with Bayer 73. *Id.* at 8, 9.

6. Pursuant to the program, TFM was released into Boquet River on the New York side of Lake Champlain, during the morning of September 11. Affidavit of Plaintiff Jeffrey W. Elliott in Support of Motion for Temporary Restraining Order, September 18, 1990 (Plaintiffs' Exhibit # 2) (hereafter Elliott's First Affidavit), at ¶ 15.

7. The final release of the 1990 series was scheduled to occur at approximately 8 a.m. on September 23, 1990, in Lewis Creek, which empties into the lake in North Ferrisburg, Vermont.

8. Lake Champlain supports native, nonparasitic species of lamprey in addition to the sea lamprey, as well as other fishes, mollusks, and other aquatic animals. FEIS at 82–98.

9. TFM affects not only sea lampreys. The chemical also may harm numerous other species, including certain plants and invertebrates as well other fishes. FEIS at 123–172.

10. Plaintiff Jeffrey W. Elliott is an aquatic biologist from Lancaster, New Hampshire, who uses the Lake Champlain region for recreation and study.

11. Elliott is an active member of Plaintiff Preserve Appalachian Wilderness (PAW), a citizens organization with members throughout the northeastern United States, dedicated to the preservation and enhancement of wilderness and the diversity of species in the region.

12. Elliott first learned of the Lake Champlain lampricide project in November 1989.

13. On September 19, 1990, plaintiffs filed suit in the United States District Court for the District of Massachusetts, seeking to permanently enjoin the project. At the same time, plaintiffs filed motions for a temporary restraining order and preliminary injunction. On the following day, that court, the Hon. Frank H. Freedman presiding, denied the motion for a temporary restraining order and ordered the case transferred to the District of Vermont.

14. Plaintiffs' complaint alleges that the project violates the federal Clean Water Act, 33 U.S.C. §§ 1251 *et seq.*, the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321 *et seq.*, and the Endangered Species Acts of Vermont and New York, 10 Vt. Stat.Ann. §§ 5401–5408; N.Y. Envtl. Conserv. § 11–0535. Only the claims under NEPA and the Vermont Endangered Species Act were raised as grounds for the motions before the Court.[1]

15. Plaintiffs argue that NEPA procedures were violated in several respects. A central claim is that the Fish and Wildlife Service did not consider, and could not have considered, certain objections to the project submitted by the U.S. Environmental Protection Agency on September 10, 1990, since implementation of the project began promptly the following day. Elliott also testified that he submitted comments that were not addressed in the FEIS. Further, he maintains that the FEIS did not address the synergistic effects caused by the combination of lampricides with chemicals already present in the lake. Finally, NEPA may be implicated by Elliott's testimony that the apparatus for dispersing TFM at the Boquet River was being used improperly and that the individuals monitoring this process were biased and unqualified, contrary to procedures specified in the FEIS. As to the Vermont Endangered Species Act, plaintiffs assert that the lampricide project threatens several endangered species of fish and mollusks, in violation of the Act.

16. The Vermont Endangered Species Act directs the Vermont Secretary of Natural Resources to adopt by rule a state-endangered species list and a state-threatened species list. 10 Vt. Stat.Ann. § 5402(a). A species is determined to be endangered "if it normally occurs in the state and its continued existence as wildlife or a wild plant in the state is in jeopardy." *Id.* § 5402(b). A species is determined to be threatened "if its numbers are significantly declining because of loss of habitat or human disturbance and unless protected will become an endangered species." *Id.* § 5402(c). The Act proscribes the killing of any member of an endangered or threatened species, except as authorized by the Secretary. *Id.* § 5403(a).

17. The Vermont Agency of Natural Resources has promulgated regulations containing state-endangered and threatened species lists. Vermont Fish and Wild-

**1.** At the hearing, plaintiffs introduced evidence to support their allegations that the lampricide program violates NEPA and the Vermont Endangered Species Act. The Court makes no findings as to these allegations and intimates no view on their merits; plaintiffs' motions are denied, as explained below, solely because plaintiffs have failed to establish that they will suffer irreparable harm from the September 23 application of lampricide.

life Regulations § 10 (effective June 23, 1989), *reprinted at* 10 Vt.Stat.Ann.App. § 10.

18. Plaintiffs assert that "the release of lampricides into Lake Champlain and its surrounding rivers and streams has caused and will cause immediate and irreparable harm to the ecology of the Lake Champlain region, including harm and death to endangered species." Plaintiffs' Motion for Preliminary Injunction.

19. More specifically, plaintiff Elliott alleges that "TFM will kill any and all species of lamprey without distinction," that "[a]s a molluscide, TFM will kill numerous species of mollusks, including at least clam species which are known to me to be in danger of extinction throughout the states of Vermont and New York," and that "TFM is toxic to many small aquatic species ... which are known to me to be in danger of extinction throughout the states of Vermont and New York." Elliott's First Affidavit, at ¶¶ 12, 13. In a second affidavit, Elliott claims that numerous species listed by the New York Natural Heritage Program as vulnerable or threatened species in New York State "will suffer irreversible harm by the release of TFM into the watershed of Lake Champlain." Affidavit of Plaintiff Jeffrey W. Elliott in Support of Motion for Temporary Restraining Order, September 18, 1990 (Plaintiffs' Exhibit # 1), at ¶ 3.

20. Among the species identified by Elliott, only the lake sturgeon appears on the Vermont Endangered Species List of the Agency of Natural Resources. Four species—all fish—listed by Elliott appear on the Vermont Threatened Species List: eastern sand darter, northern brook lamprey, quillback, and American brook lamprey. No threatened or endangered species of mollusk are known to live in proposed treatment areas. See FEIS at 121.

21. None of the species on the Vermont lists are known to exist in Lewis Creek. FEIS at 90–91.

22. Of these species, only the lake sturgeon and the quillback inhabit the lake itself; the remaining four live only in streams or rivers within the lake's watershed. FEIS at 90–91.

23. Treatment of streams with TFM is designed to insure that the chemical concentration remains within a restrictive range. FEIS at 190.

24. The Fish and Wildlife Service projected that, among threatened or endangered species, only the northern brook lamprey and eastern sand darter would be affected by the lampricide treatments, with effects on the latter "of insignificant impact to the whole population." Neither species inhabits Lewis Creek or waters downstream of Lewis Creek. FEIS at 142, 198. No threatened or endangered species is expected to suffer significant risk from TFM treatment in Lewis Creek. *Id.* The projections are based on considerable factual evidence, including laboratory studies of toxicity of TFM to sea lampreys and nontarget fish, records of impacts on nontarget fish from about 2,000 Great Lakes stream treatments, studies of caged nontarget fish subjected to routine treatments, and results of bioassays of TFM against nontarget fish in water from a Lake Champlain tributary. *Id.* at 141.

25. The Aquatic Nuisance Control Permit issued for the lampricide project by the Department of Environmental Conservation of the Vermont Agency of Natural Resources states that only two species formally recognized as threatened by the State of Vermont "will be potentially impacted by the proposed TFM treatment." These are the American brook lamprey, in Trout Brook, and the northern brook lamprey, in Indian Brook. Permit included in FEIS at K–2, 5–6. Indian Brook was subsequently withdrawn as a site for treatment.

26. On September 11, 1990, Elliott observed officials dispersing lampricides into Boquet River, on the New York side of the lake. Elliott noticed one dead sea gull and dead insects of two species, but no other dead animals in the vicinity during and following the dispersal of the lampricides. Elliott also observed fish that appeared to be in stress.

■ 27. The Court finds that the release of lampricides in Lewis Creek is unlikely to have any significant harmful impact on any endangered or threatened species.

28. In a Renewed Motion for Temporary Restraining Order, filed in this Court on September 21, 1990, plaintiffs raised as an additional ground for the motion "a strong possibility that the release of these lampricides into Lake Champlain will result in deleterious health effects on those many individuals who receive their drinking water from this source."

29. On this point, plaintiffs rely primarily on the September 10, 1990 letter by Elizabeth Higgins Congram, Assistant Director for Environmental Review at the Boston EPA office, to Ronald E. Lambertson, Regional Director, U.S. Fish and Wildlife Service. (Government Exhibit C.) The letter states that "any detected residues [of lampricide] would result in the need to provide the public with alternative drinking water supplies, whether requested or not."

30. The U.S. Fish and Wildlife Service took measures to mitigate any health risks attending the project, including advance notification to all affected landowners, the provision of free, commercially bottled water, and the arrangement of alternative watering of livestock in affected areas. FEIS at 191–195.

31. The FEIS also states that "toxicological literature indicates that human exposure to concentrations of TFM, Bayer 73 and other constituents or impurities in these formulations in the treatment and plume areas, will not cause adverse health effects." FEIS at 192.

32. The Commissioner of the Vermont Department of Health concluded that if TFM is applied and monitored, and the public and affected landowners notified, as outlined in the DEIS and relevant permits, there will be negligible risk to the public health. Letter to Timothy J. Burke, Commissioner, Vt. Dept. of Environmental Conservation, October 27, 1989, printed in FEIS at L–12. Efforts to protect the public are further detailed in a letter by William Bress and Michael Gates of the Vermont Department of Health to Elizabeth Higgins Congram at the EPA. FEIS at N–23.

33. No public water supplies in Vermont will be significantly affected by the lampricide project. Persons whose privately-owned water supplies may be affected will be protected by monitoring, notification, and provision of alternative water supplies. Bress & Gates Letter; testimony of Ralph Abele.

34. Plaintiffs' Renewed Motion for Temporary Restraining Order further relies on comments submitted by the Adirondack Council in response to the DEIS. Plaintiffs contend that the Adirondack Council asserts "that there is an unconsidered likelihood that components of the biocide released will result in the immediate and irreversible release of other toxics from the lake and stream bed, including PCB's and heavy metals." The Court has carefully reviewed the Adirondack Council's comments on the DEIS, reprinted in FEIS Appendix N, and finds no reference to the claim attributed to it by plaintiffs. A letter by Daniel Plumley of the Council, dated October 13, 1988, says "the DEIS should address the question of health advisories which are now in effect on PCB-laden fisheries." FEIS at N–173. A subsequent letter by Gary Randorf, Executive Director of the Council, dated January 31, 1990, expresses "concern[ ] that lamprey control and the rush to apply large doses of chemical lampricides to Lake Champlain has taken precedent [*sic*] over the many other ills now threatening to destroy the lake [such as] the dumping of toxic chemicals, including dioxin, PCBs, and chloroform...." FEIS at N–218. The Court has found no other comments by this organization referring to PCBs.

■ 35. Plaintiffs have introduced insufficient evidence to show that the release of lampricides into Lewis Creek in accordance with program mitigation measures poses a significant threat to human health.

36. Defendants filed a memorandum of law in opposition to plaintiffs' motions in this Court on September 21, 1990. The

matter was heard on September 21 and 22, 1990. Both parties were represented by counsel at the hearing, and both parties introduced documentary evidence and were prepared to offer testimony. The Court issued its oral ruling denying the motions after hearing the testimony of plaintiffs' witnesses and arguments by counsel.

## II. OPINION

■ Plaintiffs initially filed two motions, for a temporary restraining order (TRO) and for a preliminary injunction. A TRO is an order that may be granted without notice to the adverse party in limited circumstances. Fed.R.Civ.P. 65(b). Where the adverse party *has* notice, as here, and there has been an adversary hearing on the application for a TRO, it may be treated as a motion for a preliminary injunction. *Levas and Levas v. Village of Antioch, Ill.,* 684 F.2d 446, 448 (7th Cir.1982); *Delaware Valley Transplant Program v. Coye,* 678 F.Supp. 479, 480 n. 1 (D.N.J.1988). Accordingly, the motion for a TRO is treated together with the motion for preliminary injunction, and the Court disposes of them as one.

It is well established in this Circuit that a party seeking a preliminary injunction must show that it is likely to suffer possible irreparable injury if the injunction is not granted and "either (1) a likelihood of success on the merits of its case or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in its favor."

*Reuters Ltd. v. United Press International, Inc.,* 903 F.2d 904, 907 (2d Cir.1990) (quoting *Coca–Cola Co. v. Tropicana Products, Inc.,* 690 F.2d 312, 314–15 (2d Cir.1982)). A showing of "probable irreparable harm" is a prerequisite to relief:

the moving party must demonstrate that such injury is likely before the other requirements for the issuance of an injunction will be considered. Irreparable harm must be shown by the moving party to be imminent, not remote or speculative, and the alleged injury must be one incapable of being fully remedied by monetary damages.

*Id.* (citation omitted). See also *Fireman's Fund Insurance Co. v. Leslie & Elliott Company, Inc.,* 867 F.2d 150, 151 (2d Cir. 1989) ("a finding of irreparable harm is an absolute prerequisite to the issuance of an injunction").

■ Violations of the procedures required by NEPA do not by themselves constitute irreparable harm sufficient to justify injunctive relief. *Town of Huntington v. Marsh,* 884 F.2d 648, 653 (2d Cir.1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 1296, 108 L.Ed.2d 473 (1990). The alleged harm must stem from the government action sought to be enjoined and must be of the sort that the statutes relied upon are designed to avert. Thus, in *Natural Resources Defense Council v. Callaway,* 524 F.2d 79, 82–83 (2d Cir.1975), the court, finding violations of NEPA, directed the entry of a preliminary injunction prohibiting the Navy from continued dumping in the Long Island Sound where "substantial evidence" was presented that the polluted material proposed for deposit at the site would disperse and "contaminate and destroy the first nurseries and marine resources on the coast." An injunction should not issue, by contrast, where the harms are unrelated to the law relied upon. Plaintiff Elliott, for example, observed insects and a gull that he believed may have been killed by TFM in the Boquet River. Assuming TFM was the cause of these animals' demise, they were undoubtedly irreparably injured, in one sense, by the actions of the government agencies. But the irreparable injury that plaintiffs must show to justify a preliminary injunction must be an injury of the sort that is legally actionable. Significant damage to the overall ecology of the lake or harm to threatened or endangered species might constitute irreparable injury in the required sense, but plaintiffs have been unable to persuade the Court that such injury is likely to occur as a result of the Lewis Creek lampricide release.[2]

---

**2.** Of course, the present concern of the Court relates only to Lewis Creek; plaintiffs will have the opportunity in future proceedings to develop

The phrases used by the Second Circuit to describe the burden of proof—a showing of "probable irreparable harm" or that plaintiffs are "likely to suffer possible irreparable injury if the injunction is not granted"—are not self-explaining, and leave open the question whether plaintiffs must show by a preponderance of the evidence that they *will* suffer irreparable harm without the injunction, or whether plaintiffs need only show something less conclusive, perhaps "a threat of irreparable injury." See *Town of Huntington*, 884 F.2d at 653 (proof of "threat of irreparable injury" to environment, in addition to a violation of NEPA procedures, would justify injunctive relief). Whatever the level of proof required, however, plaintiffs in this case have failed to carry even a minimal burden. They have not persuaded the Court that irreparable harm is of any significant likelihood as a result of the release of TFM in Lewis Creek. Harm to threatened and endangered species and to human health was alleged, but the allegations are not supported by the evidence presented. While vulnerable species live in Lake Champlain and its tributaries, there is no reason in fact to suppose they will suffer harm from the Lewis Creek release. Similarly, while it may be true that the effects of TFM on humans are uncertain and adverse, plaintiffs have not shown that the TFM release in Lewis Creek is likely to expose the public to the chemical.

Plaintiffs are legitimately concerned for the health of Lake Champlain and the life it supports. The heart of their complaint is expressed in ¶ 17 of Elliott's First Affidavit: "[T]he loss of biological diversity and stability which will result from the lampricide project cannot be predicted. Any loss of biological diversity which results will deplete the resiliency of the Lake Champlain ecosystem." A preliminary injunction issued by this Court would not stop the Lake Champlain lampricide project, however. Six of the seven lampricide applications scheduled for 1990 occurred prior to the commencement of proceedings in this Court. The project is slated to continue in the coming years, and may be enjoined should the plaintiffs persuade the Court of the merits of their complaint. But the request for a preliminary injunction concerns only the seventh 1990 application, to Lewis Creek; as to that particular episode, plaintiffs have not carried their burden of showing a threat of irreparable harm should the preliminary injunction not issue. Because the motion is disposed of on this threshold ground, the Court does not address, and intimates no views on, plaintiffs' likelihood of success on the merits. Accordingly, the Renewed Motion for Temporary Restraining Order and the Motion for Preliminary Injunction are denied.

a case that the lampricide program as a whole should be enjoined.