UNITED STATES of America, Plaintiff,

v.

Adele SCHMITT, John Schmitt and Adam Schmitt, d/b/a Channel Marine Suzucki and Schmitt's Marina, and Carl Midnica, individually and as President of Cave Diggers, Inc. and Adam Schmitt d/b/a Adams Fishing Station, Defendants.

No. CV 89–2126 (ADS).

United States District Court, E.D. New York.

April 17, 1990.

**1036**

Andrew J. Maloney, U.S. Atty., E.D. N.Y., Brooklyn, N.Y. by Kevan Cleary, Asst. U.S. Atty., for plaintiff.

Citak & Citak, New York City by Burton Citak, for defendants John Schmitt, Adam Schmitt d/b/a Channel Marine Suzucki and Schmitt's Marina, and Adam Schmitt d/b/a Adams Fishing Station.

Semon & Mondshein, Woodbury, N.Y. by Lee J. Mondshein, for defendants Carl Midnica and Cave Diggers, Inc.

## MEMORANDUM AND ORDER

SPATT, District Judge.

Situated virtually in the shadows of the skyscrapers of New York City, and recognized as one of the few national parks within an urban area, Gateway National Recreational Area ("Gateway"), which includes the Jamaica Bay Wildlife Refuge ("Jamaica Bay"), is a natural and national resource protected by federal law. Created to "preserve and protect for the use and enjoyment of present and future generations an area possessing outstanding natural and recreational features" (86 Stat. 1308), Gateway is the largest pristine open space within the borders of the City of New York, and is one of the first urban parks in our nation. Jamaica Bay in particular is a way station for various species of birds, fish and animal wildlife.

This application by the Government to preliminarily enjoin certain defendants who operate a marina within Jamaica Bay from violating the Rivers and Harbors Appropriation Act, 33 U.S.C. § 403, the Clean Water Act, 33 U.S.C. §§ 1311, 1344, and from trespassing on government owned property, raises the following issues: (1) has the Government demonstrated a likelihood of success as to any of its causes of action?; (b) must the Government demonstrate irreparable harm in order for a preliminary injunction to issue?; and (c) is the Government precluded from obtaining preliminary injunctive relief by reason of (a) equitable estoppel, (b) laches, and/or (c) governmental selective enforcement?

For the reasons set forth below, the Court finds that the Government has established a likelihood of success on the merits that defendants John Schmitt, Adam Schmitt d/b/a Channel Marine Suzucki and Schmitt's Marina, and Adam Schmitt d/b/a/ Adams Fishing Station (collectively, the "Schmitts")[1] violated both the Rivers and Harbors Appropriation Act and the Clean Water Act. The Court also finds that the Government need not prove irreparable harm in order for a preliminary injunction to issue based on a violation of the Rivers and Harbors Appropriation Act. Further, the Government has established irreparable harm with regard to the Rivers and Harbors Appropriation Act and the Clean Water Act causes of action. Finally, the Court finds that the Government cannot be precluded from obtaining preliminary injunctive relief in this case on the grounds of either equitable estoppel, laches, and/or selective enforcement.

## BACKGROUND

The Government instituted this action by service of a summons and complaint dated June 26, 1989 setting forth eight causes of action which allege, in substance, that (1) the defendants constructed and operate a boat marina (hereinafter referred to as the "Schmitt Marina") with a sea wall partially on real property owned by the Government

---

1. Defendant Adele Schmitt is deceased. (Transcript of Hearing ["Tr."] at p. 3) The Government has not consented to deleting her name from the complaint. (Tr. at p. 159)

without the Government's consent, (2) the defendants constructed and operate a marina without plans recommended by the Army Corps of Engineers (the "Corps") and authorized by the Secretary of the Army, and that (3) the defendants have caused or are causing the discharge of fill material into navigable waterways. The complaint seeks damages, a declaratory judgment and injunctive relief.

The Schmitts served an answer in which they substantially denied the allegations of the complaint and asserted fourteen affirmative defenses. Defendants Carl Midnica and Cave Diggers, Inc. (collectively, "Midnica") answered and denied the substantive allegations in the complaint, asserted three affirmative defenses and alleged five cross-claims against the Schmitts.

By Order To Show Cause signed by The Honorable Eugene H. Nickerson[2] on November 29, 1989, the Government moved for a preliminary injunction, pursuant to Fed.R.Civ.P. 65, enjoining the Schmitts from:

"(a) further dumping on and filling of tidal wetlands in and on Jamaica Bay (b) further expanding the Schmitt's Marina docks and (c) docking boats at the Schmitt's Marina docks during the 1990 boating season ..."

The Government subsequently clarified its request for preliminary injunctive relief vis a vis the Schmitts by stating that it "would like the status quo maintained which is that the boats are not on federal property ... and secondly, that [the boats] are not at the dock which is in violation of the Army Corps regulations as in section 403." (Tr. at pp. 1001 and 1003)[3]

2. The instant action was transferred to this Court by Order of the Clerk of the Court for the Eastern District of New York dated December 15, 1989.

3. Pursuant to Rule 68 of the Fed.R.Civ.P., the Schmitts submitted an Offer to the Court dated December 27, 1989 by which they consented "(a) to be enjoined from any dumping on and filling of tidal wetlands in and on Jamaica Bay [and] (b) ... not to expand the Schmitt's Marina docks from the amount presently on said premises." The Government did not respond to the Schmitts' Offer.

## THE HEARING

A hearing on the Government's application was commenced on December 22, 1989, and continued intermittently over the course of ten days of testimony, concluding on February 16, 1990.[4] Post-trial memoranda were submitted to the Court on March 9, 1990.

On April 4, 1990, the court issued an oral decision temporarily enjoining the Schmitts from putting any craft into the Schmitt Cove (as defined on page 8, *infra*). (*See* April 4 Transcript at p. 7 ["I am enjoining the defendants temporarily until the rendering of my decision on the application of the government for [a] preliminary injunction from putting any boats in the cove, either at the docks or in the floating docks...."])

A summary of the evidence introduced at the hearing follows below.

### A. *The Plaintiff's Case*

#### 1. *The Testimony*

Dr. John T. Tanacredi is a research ecologist and Chief of the Division of Natural Resources and Environmental Compliance at the National Park Service at Gateway. (Tr. at p. 23) Dr. Tanacredi was qualified as an expert in ecology and in the operation and management of national parks. (Tr. at p. 25)

Dr. Tanacredi testified that the legislation which established the National Park Service in 1972 created Gateway. (Tr. at p. 26) The property comprising Gateway was conveyed to the United States by the City of New York in 1972 and was placed in operation in 1974. (Tr. at p. 310) Jamaica

4. With the consent of all parties, including counsel for Midnica (Tr. at p. 265), all testimony admitted in evidence at this hearing on the Government's application for a preliminary injunction is deemed admitted in evidence at any future trial. (Tr. at p. 266) Although the Government's application does not seek injunctive relief against Midnica, their counsel's consent, presence and opportunity to conduct cross examination at the hearing insured that no party would be prejudiced by this procedure.

Bay is a district within Gateway consisting of 17,000 acres of land and water in the shadow of the World Trade Center; it is one of the largest open spaces within Brooklyn and Queens and it is operated as a wildlife preserve and a haven for a multitude of fish, animal and floral wildlife. (Tr. at p. 27; Plaintiff Exhibit 1)

The Schmitt Marina is located in an area called the "Big Egg Marsh" (Tr. at p. 280), within the confines of Jamaica Bay. (Tr. at pp. 32 and 107) The Big Egg Marsh is a "protection zone," "the highest form of management classification that the National Park Service gives to properties it manages." (Tr. at p. 108)

The Schmitt Marina is on a body of land in Queens County in the middle of Jamaica Bay known as the Broad Channel Community, which is a man-filled area (Tr. at p. 277) within the Big Egg Marsh, on the western portion of Beach Channel Drive. Dr. Tanacredi testified that the Broad Channel Community, located on a causeway between the Rockaways and Queens, is "not under the National Park Services's direct jurisdiction." (Tr. at pp. 133–34)

Dr. Tanacredi also testified that Jamaica Bay is a navigable waterway, testimony which was unrefuted by the Schmitts. (Tr. at p. 635)

The Schmitt Marina consists of a land area, floats, floating docks, and support structures (*i.e.* buildings) in a diameter of approximately 1200 to 1500 feet on Jamaica Bay. (Tr. at pp. 421–22) There is a small house on the land area. The Schmitt Marina has a capacity of approximately 250 boats. (Tr. at p. 325) The Schmitt Marina has a number of floating docks and a walkway extending in a cove adjacent to the land area (hereinafter referred to as the "Schmitt Cove").

According to Dr. Tanacredi, the operation of all boats at the Schmitt Marina will contribute to polluting the environment in Jamaica Bay by the use of gasoline, sewage and waste products. (Tr. at pp. 356–57) Dr. Tanacredi testified at length and in detail regarding the adverse impact on the ecology of the inter-tidal marshes and wildlife in the area of the Schmitt Marina as a result of the installation and the mooring of boats at the Schmitt Marina. (*See, e.g.,* Tr. at pp. 98–101)

Several miles north-west of the Schmitt Marina by boat and "tens of miles" northwest of the Schmitt Marina by car (Tr. at p. 336) is the Barren Island Marina. Barren Island Marina has a capacity of approximately 600 to 700 boats (Tr. at p. 309), and is situated in Dead Horse Bay, west of Flatbush Avenue in Brooklyn and across from Floyd Bennett Field. (Tr. at pp. 146 and 148) The Barren Island Marina is a regulated facility licensed as a concessionaire pursuant to a permit issued by the Corps. (Tr. at pp. 146, 149 and 310) Unlike the Barren Island Marina, the Schmitt Marina is not licensed and has no permit from any governmental agency.

The main government witness was Dr. Arthur LaPerriere, an ecologist and the holder of a doctorate in wildlife biology as well as degrees in chemistry and meteorology. (Tr. at pp. 73–75) Dr. LaPerriere is employed by the Corps as Chief of Harbor Supervision. (Tr. at p. 62) In that capacity he enforces the statutes of the United States involving the Corps, including the Clean Water Act and the Rivers and Harbors Appropriation Act. (Tr. at p. 62)

Dr. LaPerriere's testimony was based on his experience in wildlife ecology, a review of the Government files and an inspection of the Schmitt Marina on December 19, 1989. (Tr. at pp. 63–64) Dr. LaPerriere testified that the owners of the Schmitt Marina never sought a permit from the Army Corps of Engineers and no permit of any kind was granted to the Schmitt Marina. (Tr. at p. 63)

On his visit to the Schmitt Marina on December 19, 1989, Dr. LaPerriere observed "that there had been discharge of construction debris, including asphalt" into the Schmitt Cove. (Tr. at p. 67) Based on his observation, Dr. LaPerriere testified that 10 acres of natural tidal marsh had been destroyed at the Schmitt Marina since 1976. (*Id.;* *see also* Tr. at p. 85 ["Previously, this [tan portion on Plaintiff's Exhibit 3] was all marshland. Now its construction debris"])

Dr. LaPerriere identified where on Plaintiff's Exhibit 4 (a 1976 black and white print aerial photograph of Little Egg Marsh which includes the Schmitt Marina [Tr. at pp. 44–49]) the Schmitt Marina had been constructed. (Tr. at p. 69) Examining Plaintiff's Exhibit 4, Dr. LaPerriere testified that the photograph:

"Demonstrates that the fill where boats are currently stored and a crescent shaped area of fill was not there in 1976, and that there had been a discharge of toxic pollutants into waters of the United States."

(Tr. at p. 68) Dr. LaPerriere described the "fill" as containing "asphalt which leaks aromatic hydrocarbons [and] other petroleum carbons into the waterway." (*Id.*)

Comparing Plaintiff's Exhibit 4 (the 1976 photograph) with Plaintiff's Exhibit 3, "an aerial photograph that was taken on August 8, 1984" (Tr. at pp. 40–44), Dr. LaPerriere testified as follows:

Q: What does it demonstrate to you that photo, the Exhibit 4?

A: It demonstrates that the fill where boats are currently stored and a crescent shaped area of fill was not there in 1976, and that there had been a discharge of toxic waste pollutants into waters of the United States.

Q: When you say "toxic," what specifically is toxic, rather than using a conclusory term, tell the Court?

A: Well, fill, even if it was clean fill, which in this case it was not, is considered a toxic pollutant because it kills all of the organisms that live in the substrata, the plants, anything that happens to be there is simply buried, deprived of oxygen and killed.

Q: Now, what do you mean by "clean fill," as opposed to non-clean fill?

A: Well, clean fill would be sand or gravel or rocks. However, the fill at this particular site contains asphalt which leaks aromatic hydrocarbons, other petroleum carbons into the waterway. It is a continuing thing.

Q: What do you say has been done since the photograph, Plaintiff's Exhibit 4, in the area that you observed last week? What specifically, what has been done?

A: *Well, approximately ten acres of tidal marsh have been destroyed by fill, and a large number of floats have been added.* Essentially, a marina has been constructed and storage area for boats.

THE COURT: A marina has been constructed in what area?

A: In the cove.

THE COURT: And in 1976 it wasn't there?

A: No, sir.

THE COURT: Could you put—show me where it is?

A: Yes, sir.

THE COURT: You put a red mark where you say it is?

A: This is the cove (indicating).

 \*    \*    \*    \*    \*    \*

This area that you see dark was marsh, and now the fill extends out here and around into this marsh. This is used as a boat storage area.

In addition, you can see there was only one dock on the 29th of March, 1976. Now the cove is virtually filled by the docks.

(Tr. at pp. 68–69 [emphasis supplied]; *see also* Tr. at pp. 1276–78)

The Government introduced aerial maps and photographs of the Schmitt Marina area, including aerial map photographs taken on November 20, 1966 (Plaintiff's Exhibit 23), May 28, 1970 (Plaintiff's Exhibit 17) and August 8, 1984 (Plaintiff's Exhibit 3) (*see* Tr. at pp. 1043–46 and 1075–76), which, according to Dr. LaPerriere, demonstrate the changes in the area during an eighteen year period as follows:

* Nov. 20, 1966—no fill in the Schmitt Cove area, a small dock attached to the land and three boats moored in the water.

* May 28, 1970—same small dock as in 1966 photograph, approximately six boats moored in the water and 20 boats moored to the dock.

* Aug. 8, 1984—The presence of additional floating docks and a walkway are noted in the Schmitt Cove; 10 acres of inter-

tidal marsh have been filled in, where there is now no vegetation and is "denuded."

(Tr. at pp. 1041–46) Dr. LaPerriere testified that no permit of any kind was ever issued by any governmental or municipal agency to the Schmitt Marina or to any member of the Schmitt family. (Tr. at pp. 1044–45, 1103 and 1105)

As to the impact of the Schmitt Marina on the ecology in Big Egg Marsh, Dr. LaPerriere stated that marsh islands are in and surround the cove. The marshes are the most productive ecological systems on earth and supply the primary organisms for food of invertebrate species, fish and birds who traverse the Atlantic flyway, a major bird migratory route. (Tr. at pp. 95–98)

Dr. LaPerriere testified that the operation of the Schmitt Marina has "an adverse impact on the wildlife because of impact on the water quality." (Tr. at pp. 76 and 85) In addition, there is a long-term ecological effect caused by the destruction of the marshes according to Dr. LaPerriere, namely, the erosion of the land proper, which is a loss of the wildlife and flora habitat. (Tr. at p. 95) This is especially critical where there is a small marsh area to begin with, as in the Big Egg Marsh. (Tr. at p. 97)

According to Dr. LaPerriere, the docking of motor boats in the Schmitt Cove will cause habitat elimination. (Tr. at p. 95) In addition, petroleum waste products and chemicals used in marina activities such as paints, solvents and wood preservatives pollute the water with highly carcinogenic and nitrogenic elements which cause abnormal cell growths in certain marine organisms. This petroleum pollution is especially toxic in sensitive intertidal marshes, as are present in the area of the Schmitt Marina. (Tr. at pp. 99–101)

Importantly, Dr. LaPerriere testified that the entire Jamaica Bay, including the Schmitt Cove (identified by Dr. LaPerriere with a red circle on Plaintiff's Exhibit 3 [Tr. at p. 84]), is navigable water. (Tr. at pp. 66, 1027–28, 1093 and 1236) The U.S. Army took jurisdiction over the navigable water and adjacent wetlands in Jamaica Bay (and the Schmitt Cove) to the high tide water line on October 18, 1972. (Tr. at pp. 1242–43) As long ago as 1897 the U.S. Army recognized that Jamaica Bay is navigable water. (Tr. at pp. 1028 and 1236) In fact, Dr. LaPerriere stated that there is substantial maritime commerce in Jamaica Bay with more than 2 million tons of commerce per year. (Tr. at p. 1029)

Schmitt cove has a depth of 16 feet at its deepest, 15 feet at the mouth of the cove and 4 to 10 feet at the shoal areas. (Tr. at pp. 1253–55) However, according to Dr. LaPerriere, the depth of the water does not determine its navigability. (Tr. at p. 1281) If the water is in a tidal area it is navigable even if the water is shoal. (Tr. at pp. 67 and 1280)

Under the Rivers and Harbors Appropriation Act, jurisdiction is determined by mean high water. Using Plaintiff's Exhibit 16, a United States geological survey map, Dr. LaPerriere testified that the Big Egg Marsh was within the mean high tide line. (Tr. at pp. 1032–34) Dr. LaPerriere indicated on Plaintiff's Exhibit 3 the approximate location of the mean high tide line, which included the Schmitt Marina and the floating docks. (Tr. at p. 1039) Dr. LaPerriere also testified that the Corps' jurisdiction up to the mean high tide could not be defeated by the construction of land fill which would arguably push the mean high tide line seaward: "[t]he rule of jurisdiction is once Section [403] jurisdiction exists section [403] jurisdiction always exists regardless of man made altering." (Tr. at p. 1040)

Under the Clean Water Act, jurisdiction is determined by "spring tide" which is the highest tide of the year in the absence of a tide surge caused by a storm. (Tr. at pp. 1242–43) As he succinctly stated, "If you let the tide in, you've brought the Army in." (Tr. at p. 1103) Referring to Plaintiff's Exhibit 16, Dr. LaPerriere testified that the Schmitt Marina is within the high tide line and therefore within the Corps' jurisdiction under the Clean Water Act. (Tr. at p. 1037)

On cross-examination, Dr. LaPerriere testified that "harbor lines" (see 33 U.S.C. § 403) had been abolished on December 28, 1951 (Tr. at pp. 1084, 1086, 1092, 1249 and 1282), and, in any event, the Schmitt Marina was not shoreward of the harbor lines but was seaward of or within the harbor lines. (Tr. at pp. 1092–93)

Michael P. Flynn grew up in the Broad Channel community. He has been openly opposed to the operation of the Schmitt Marina and made a number of complaints to various municipal agencies. (Tr. at p. 496) Since May, 1982 he has owned a home at 76 West 18th Road, which is approximately 40 feet from the Schmitt Marina. (Tr. at p. 445) Mr. Flynn is familiar with the Schmitt Marina since the 1960's, and in fact worked there during the summers of 1977 and 1978. (Tr. at p. 447) He testified that in the 1960's there were no floating docks in the Schmitt Cove. During that period the boats were at moorings. Now, he stated, there are floating docks at which approximately 300 to 350 boats can be moored. (Tr. at pp. 447–48)

Mr. Flynn pointed out the progression in the construction of the floating docks, and a walkway to the docks, in the Schmitt Cove. For example, Plaintiff's Exhibit 4, the photograph taken in 1974, shows no docks in the cove. (Tr. at p. 451) Mr. Flynn testified that in 1977 and in 1978 a walkway extending west from the Schmitt Marina was constructed in addition to the construction of finger slips for purposes of docking. (Tr. at p. 452) Plaintiff's Exhibit 3, the 1984 aerial photograph, shows floating docks and a walkway. (Tr. at p. 448 ["finger slips for each individual boat, two boats for each finger"]) Plaintiff's Exhibit 6, a 1988 photograph, shows additional moorings in the cove. (Tr. at p. 449 ["An extension was made towards 18th Road, parallel with the shoreline, extending to the right of way for the 18th–19th Road Canal"]) Mr. Flynn testified that Plaintiff's Exhibit 6 illustrated that the Schmitt Marina expanded since 1984 by the construction of mooring docks on the north-west side of the Schmitt Marina. (Tr. at pp. 450–51)

Mr. Flynn also testified that two riprap walls ("a wall built out of loose fill such as broken concrete without any bulkheading" [Tr. at p. 456]) were constructed at the Schmitt Marina. The first riprap wall was built at the northwest corner of the Schmitt Marina in the early to mid 1970's. (Tr. at pp. 456–57) He saw Adam Schmitt using a bulldozer to push the riprap to the northwest corner of the Schmitt Marina. (Tr. at pp. 487–88) Used for boat storage (Tr. at p. 457), the wall was built of loose fill such as broken concrete on top of the marshland, which pushed the riprap land further out in the bay. Before the riprap wall was built, Mr. Flynn testified that the ground was wetland and part of the bay. (Tr. at p. 494)

The second riprap wall was built during 1976–1977 in a semi-circle on the crescent around the Schmitt Cove near the Schmitt Marina's office. (Tr. at p. 457) This wall was made of broken concrete. Mr. Flynn had a conversation with Adam Schmitt, the father of John Schmitt, some time in 1977 or 1978, at which time Adam Schmitt said he intended to build a wall out of concrete riprap to extend out as far as the sandbar shown in Plaintiff's Exhibit 12. (Tr. at pp. 460 and 462–63)

Mr. Flynn indicated on Plaintiff's Exhibit 3, the 1984 aerial photograph, the presence of filled in land, which the Schmitts did in stages, beginning in 1977. (Tr. at p. 467) For example, the former office area was filled in from 1981 to 1982. (Id.) Prior to the fill, the northwest corner of the Schmitt Marina constituted wetlands, which was covered over with riprap by Adam Schmitt.

In the Spring of 1988, Mr. Flynn had a conversation with defendant John Schmitt in which he told Mr. Schmitt that "he went too far" and asked him to scale back the north expansion of the Schmitt Marina which was near his home. Mr. Schmitt responded that Mr. Flynn was asking too much and "I [Mr. Flynn] could do what I had to do but the docks were staying." (Tr. at p. 493)

Daniel Turbidy has lived in Broad Channel for over thirty years and is familiar with the Schmitt Marina. (Tr. at p. 1117) He presently resides in close proximity to

the Schmitt Marina. (Tr. at p. 1118) Mr. Turbidy testified that the floating docks in the Schmitt Cove were not present during the period from 1962 to 1964. (Tr. at p. 1121)

During the years 1976 and 1977, and in 1985, Mr. Turbidy saw garbage trucks dumping industrial waste in and around the Schmitt Marina area, usually after 10 P.M. The trucks dumped this waste onto green marshlands and also in the area of the crescent surrounding the Schmitt Cove (which he indicated by looking at Plaintiff's Exhibit 3). He also saw bulldozers spread the garbage and place dirt and rock over it. (Tr. at pp. 1122–1124)

John Burke is an environmental conservation officer for the New York State Department of Environmental Conservation ("DEC"), whose duty is to enforce DEC laws and regulations with regard to environmental quality. (Tr. at pp. 1189–90) He visited the Schmitt Marina on November 19, 1984 while on routine coastal patrol, and observed that a new breakwall was built and there was riprap filling up to the landward side of the breakwall. (Tr. at pp. 1190; *see also* Plaintiff's Exhibit 25) As to what he saw on November 19, 1984, Mr. Burke testified as follows:

Q: What did you see when you approached the marina?

A: There was no activity taking place, the equipment was not operating. The soil had been graded. *There had been no vegetation left.* There were tracks from a vehicle similar to [a bulldozer].

The soil was still setting, the wood, the breakwall constructed appeared to be new treated wood.

THE COURT: How do you know there was vegetation there?

A: *The entire land was vegetated and this was barren soil with concrete—*

\* \* \* \* \* \*

A: The soil was very soft, still setting, indicating it was just dumped or worked. The entire area where the trucks were heavily vegetated.

(Tr. at p. 1194 [emphasis supplied])

Mr. Burke also observed that the breakwall, parallel to Jamaica Bay, approximately 80 feet long and made of treated timber (Tr. at p. 1201), was in the wetland itself and was below the mean high water mark. (Tr. at p. 1196; *see* Plaintiff's Exhibits 25A to 25D) Mr. Burke testified that if the wall was not present the mean tide would wash over the land area protected by the breakwater. (Tr. at p. 1196)

During his visit, Mr. Burke was approached by a man who identified himself as John Schmitt, the owner of the property. As to his conversation with Mr. Schmitt, Mr. Burke testified as follows:

Q: What did he say?

A: He asked me who I was. I explained I was a state conservation officer and I asked if he was the owner of the property.

Q: What did he say?

A: Yes.

Q: What did you say to him?

A: If he was responsible for the activity taking place.

Q: What?

A: Building the breakwall and the back filling, soil dumped in on the landward side.

Q: What did he say?

A: Yes, he was.

Q: What was the rest of the conversation?

A: I asked if he had a permit from the State of New York.

Q: What did he say?

A: No.

Q: Was there any further conversation?

A: He stated he wasn't aware he required a permit for this activity.

Q: What happened?

A: I advised that it did require a permit from the Department of Environmental Conservation and he was to cease and desist activity until he obtained a permit from the DEC.

(Tr. at pp. 1195–96)

### 2. *The Demonstrative Evidence*

The demonstrative evidence, and in particular, the photographs and aerial maps of the area from the year 1962 to the present

date, is crucial to the Court's determination of the issues in this preliminary injunction hearing.

Photographs of the Schmitt Marina taken in the 1960's were introduced. (Defendant's Exhibits W, X and Y; Tr. at p. 1154) In the 1960's the crescent-shaped area of land bordering the Schmitt Cove contained green intertidal marsh and smooth cord grass. By 1984, the photographs in evidence (*see, e.g.,* Plaintiff's Exhibit 3 [1984 aerial photograph]) reveal that the crescent-shaped area was filled in with construction debris including pieces of asphalt, metal and broken brick. The remaining unfilled portion of the crescent still is a salt marsh area and is inundated regularly by tidal waters.

In addition, the northeast bank of the Schmitt Cove, which was covered by vegetation and smooth grass in the 1960's (*see* Defendant's Exhibit W), was bulkheaded and backfilled by 1984 (*see* Plaintiff's Exhibit 3). The Polaroid photographs taken by DEC Investigator Burke (Plaintiff's Exhibits 25A to 25D) also clearly show the breakwall built by the defendants over the tidal marshland area.

### B. *The Defendant's Case*

John M. Schmitt is the son of Adam Schmitt and the grandson of Adele Schmitt. (Tr. at p. 1298) He was born in Broad Channel in 1951. (Tr. at p. 1299) Mr. Schmitt was a New York City police officer from 1973 to 1976 and was employed in the Colorado Sheriff's Office until 1981, when he returned to New York. (Tr. at pp. 1299–1300)

Mr. Schmitt testified that his grandfather purchased the Schmitt Marina in 1944 and his grandmother leased the property from the City of New York. (Tr. at p. 1300 and 1305) Adele Schmitt sold her interest in the property to his father Adam, the present owner, in 1965. (Tr. at p. 1310) In support of his claim that his family has a lease of the property from the City of New York, Mr. Schmitt testified that the Schmitt Marina receives a monthly rental statement from the City of New York, which is paid. (Tr. at p. 1314)

There was no written assignment of the lease from Adam Schmitt to John Schmitt. (Tr. at p. 1313) Defendant John Schmitt has no fee interest in the ownership of the property by deed, nor is he the named tenant in the lease. (Tr. at p. 1313) He is presently the manager of the Schmitt Marina with the permission of his father. (*Id.*)

Mr. Schmitt testified that the photographic evidence (Defendant's Exhibits W [late 1940's], X [early 1960's] and Y [early 1960's]) shows that the Schmitt Marina has had a capacity for 200 to 250 boats in the water (though not necessarily in the Schmitt Cove) from the 1940's to the present. (Tr. at pp. 1323–29 and 1364) Comparing Defendants' Exhibit O (the Schmitt Marina today) with Plaintiff's Exhibit 3 (the Schmitt Marina in 1984), Mr. Schmitt testified that the type of boat fastening was changed from moorings in Plaintiff's Exhibit 3 to docks in Defendants' Exhibit O, and that there has been no increase in the size of the docks in the last two to three years. (Tr. at pp. 1329–1331) Furthermore, Mr. Schmitt testified that it was his understanding that it is more beneficial to the environment to have docks than it is to have moorings, that his marina did not have a detrimental effect on the environment at the present time, and that mussels, fiddler crabs, eels and other wildlife inhabit the waters of the Schmitt Cove. (Tr. at pp. 1332–34)

Mr. Schmitt testified that in 1982 he was told by a person from the National Park Service that somebody had dumped in the area of the crescent around the Schmitt Cove, and that Mr. Schmitt informed the Park Service person that he had been away during the time of the occurrence in question. (Tr. at p. 1343) Mr. Schmitt stated that the filling of land adjoining the Schmitt Marina was harmful to his marina, and that the bulkhead retains the dirt so that it does not wash into the water. (Tr. at p. 1344)

Mr. Schmitt testified that in December 1989 he telephoned the Corps' offices in Manhattan (Tr. at p. 1349) and had a conversation with a person named Aggie Nagi, who told him he that did not need a permit

because he already had a "general permit." (Tr. at pp. 1347–1348) Mr. Schmitt further testified that the next day he again telephoned the Corps' offices and, because Ms. Nagi was not there, spoke with a Mr. Shoemacker, who gave him the same information as Ms. Nagi did. (Tr. at pp. 1349–50)

Mr. Schmitt stated that he did not know that he had to file any permit. (Tr. at p. 1351) As to Mr. Burke's testimony, Mr. Schmitt testified that he was told by the DEC to get a permit and that he filed for one, but that "I went down to file for the permit and Cheryl Moore said you will never get a permit." (Tr. at p. 1351)

Mr. Schmitt testified that he personally never dumped on or filled in tidal wetlands in his area and that he will not do so. (Tr. at p. 1352) He objects to removing the floating docks and the walkway in the Schmitt Cove since in that event, he stated, the Schmitt Marina would be forced out of business. (Tr. at p. 1353)

On cross-examination, Mr. Schmitt testified that Schmitt Marina had no known or definite boundaries, no site markers and only unfixed, indefinite boundaries. (Tr. at p. 1362) He conceded that the floating docks were installed in the Schmitt Cove since the 1960's. (Tr. at p. 1369) Regarding Corps permits, Mr. Schmitt testified:

> THE COURT: Have any permits of any kind ever been granted to you, your father, Schmitt's Marina, by any agency of the Federal Government?
>
> A: To my knowledge, no.

(Tr. at p. 1370) Further, Mr. Schmitt admitted that the land and water portion of the Schmitt Marina, including the Schmitt Cove and the crescent around the Schmitt Cove, were part of Gateway. (Tr. at p. 1371)

## DISCUSSION

A. *Likelihood Of Success On The Merits*

1. *Rivers and Harbors Appropriation Act, 33 U.S.C. § 403*

33 U.S.C. § 403, § 10 of the Rivers and Harbors Appropriation Act, provides:

> "The creation of any obstruction not affirmatively authorized by Congress, to the navigable capacity of any of the waters of the United States is prohibited; *and it shall not be lawful to build or commence the building of any wharf, pier, dolphin, boom, weir, breakwater, bulkhead, jetty, or other structures in any* port, roadstead, haven, harbor, canal, navigable river, *or other water of the United States*, outside established harbor lines, or where no harbor lines have been established, except on plans recommended by the Chief of Engineers and authorized by the Secretary of the Army; and it shall not be lawful *to excavate or fill, or in any manner to alter or modify the course, location, condition, or capacity of, any port, roadstead, haven, harbor, canal, lake, harbor of refuge*, or inclosure within the limits of any breakwater, or of the channel of any navigable water of the United States, unless the work has been recommended by the Chief of Engineers and authorized by the Secretary of the Army prior to beginning the same."

(33 U.S.C. § 403 [emphasis supplied])

The evidence admitted at the hearing clearly demonstrates that the Government has shown a likelihood of success on its claim that the Schmitts violated § 403.

First, the Corps' jurisdiction under § 403 "extends to the line on the shore reached by the plane of the mean (average) high water." (33 C.F.R. § 329.12[a][2][1989]; *see United States v. Boccanfuso*, 882 F.2d 666, 668 [2d Cir.1989] [section 403 "gives the Corps jurisdiction up to the 'mean (average) high water' line ..."]; *United States v. Southern Invest. Company*, 876 F.2d 606, 610–11 [8th Cir.1989] [waters below the ordinary high water line "are waters of the United States for the purposes of the Corps' regulatory jurisdiction"]) Having reviewed various aerial photographs and navigational charts, Dr. LaPerriere testified repeatedly that the Schmitt Marina was within the Corps' jurisdiction under § 403. (Tr. at pp. 66, 1027–28, 1093 and 1236) This testimony was not refuted by the Schmitts at the hearing.

Dr. LaPerriere also testified that Jamaica Bay and the Schmitt Marina are within navigable waters pursuant to the Corps'

regulations. 33 C.F.R. § 329.4 (1989) provides:

"Navigable waters of the United States are those waters that are subject to the ebb and flow of the tide and/or are presently used, or have been used in the past, or may be susceptible for use to transport interstate or foreign commerce. A determination of navigability, once made, applies laterally over the entire surface of the waterbody, and is not extinguished by later actions or events which impede or destroy navigable capacity."

Dr. LaPerriere testified that Jamaica Bay is a waterway used to transport interstate and foreign commerce. (Tr. at p. 1029) (*Accord United States v. Stoeco Homes, Inc.*, 498 F.2d 597, 611 [3rd Cir.1974], *cert. denied*, 420 U.S. 927, 95 S.Ct. 1124, 43 L.Ed.2d 397 [1975] ["Any work undertaken in estuarine areas which were subject to the ebb and flow of the tide when the Army Corps of Engineers published its new regulations [on May 27, 1970] asserting the navigational servitude to the full extent, are, under the terms of these regulations, now subject to § [403] permit requirements"]; *see also Weiszmann v. District Engineer, U.S. Army Corps of Engineers*, 526 F.2d 1302, 1305 [5th Cir.1976] [citing, among others, *United States v. Appalachian Electric Power Co.*, 311 U.S. 377, 407, 61 S.Ct. 291, 85 L.Ed. 243 [1940] ["[t]here is no requirement that a body of water sustain actual commerce in order to meet the test of navigability.... Rather, the mere capability of commercial use of a body of water suffices, even if such commerce could be made possible with 'artificial aids'"]]) This testimony was also uncontroverted by the Schmitts.

Second, the Court finds that the Government has demonstrated a likelihood of success of proving that the floating docks, moorings and walkways are "obstructions" within the meaning of § 403. The Schmitts have also not challenged this element of § 403.

Third, other than the alleged "general permit" discussed in a telephone conversation in December, 1989, which the Court does not credit, the Schmitts concede that they never applied for or possessed a permit of any kind which allowed them to erect the floating docks and walkway in the Schmitt Cove. (Tr. at p. 1370)

Thus, the Government has shown a likelihood of success of proving that the obstructions built in the Schmitt Cove—the floating docks, the moorings and the walkway—were not authorized by the Corps and were built in violation of 33 U.S.C. § 403. In *Weiszmann, supra*, the plaintiff challenged the Corps' exercise of jurisdiction under the Rivers and Harbors Appropriation Act over the excavation and dredging of a canal, without a permit, in order to connect to a pre-existing canal on the plaintiff's property. The canal at issue was within navigable waters. (526 F.2d at 1303) In rejecting the plaintiff's challenge, the court held that:

"[t]he connection of Canal # 1 directly to a navigable water, however, necessarily modified the course of that pre-existing canal, as well as the connecting waters of Hawk Channel and Sugarloaf Sound. And it was clearly shown that it would be impossible to dredge the canal through without causing sediment to enter the pre-existing canal. The impact upon navigable waters through the fact of this connection is sufficient to establish a violation of § 403." (*Id.* at p. 1305)

In response the Schmitts raise a number of legal defenses that the Court will now review.

First, the Schmitts argue that contrary to Dr. LaPerriere's testimony that " 'all of the waters of Jamaica Bay are navigable,' " the Gateway Final Environmental Impact Statement (Defendants Exhibit Q), dated August 1979, as well as 33 U.S.C. § 59w "excludes portions of Jamaica Bay from the definition of navigable waters." (Schmitts' Post–Hearing Memorandum at p. 9) The Court finds it of no import, however, that "portions" of Jamaica Bay—not explicitly encompassing the area of the Schmitt Marina—are exempted from the definition of "navigable waters," given Dr. LaPerriere's testimony that the waters in and around the Schmitt Marina are navigable.

■ The Schmitts also contend that the Corps has not made a formal "determination," pursuant to 33 C.F.R. §§ 329.5–329.11, that the water in and around the Schmitt Marina is navigable. The Schmitts argue that "[t]he unsupported conclusion to which [Dr. LaPerriere] testified therefore was not based on fact and clearly violated the very regulations with which he is charged with enforcing." (Schmitts' Post–Hearing Memorandum at p. 10)

The Schmitts argument that the Corps' *non*determination as to the navigability of the water in and around their marina is evidence that that water is "nonnavigable" is without basis in the Corps' regulations. Specifically, 33 C.F.R. § 329.3, entitled "General policies," states that:

"[p]recise definitions of 'navigable waters of the United States' or 'navigability' are ultimately dependent on judicial interpretation and cannot be made conclusively by administrative agencies. However, the policies and criteria contained in this regulation are in close conformance with the tests used by Federal courts and determinations made under this regulation are considered binding in regard to the activities of the Corps of Engineers."

In addition, 33 C.F.R. § 329.14(a) provides that "[a]lthough conclusive determinations of navigability can be made only by federal courts, those made by federal agencies are nevertheless accorded substantial weight by the courts." Although the regulations, by their own terms, are not binding on federal courts as to whether or not the waters in and around the Schmitt Marina are navigable, Dr. LaPerriere's uncontroverted testimony on this point is sufficient for the Court to find that the Government has demonstrated a likelihood of success of proving that these waters are "navigable" within the meaning of 33 U.S.C. § 403.

Next, the Schmitts contend that the Government has not proven that the Schmitt Marina operates "outside established harbor lines, or where no harbor lines have been established," as set forth in 33 U.S.C. § 403. (Schmitts' Post–Hearing Memorandum at pp. 14–16) The Govern-

ment specifically addressed this point when Dr. LaPerriere testified that harbor lines had been abolished where the *Schmitt Marina* is located on December 28, 1951. (Tr. at pp. 1084, 1086, 1092, 1249 and 1282) Moreover, Dr. LaPerriere testified that all of the events alleged in the instant proceeding commenced in 1976. (Tr. at p. 1104) In the absence of any evidence introduced to the contrary by the Schmitts, the Court finds the Government's evidence in this regard to be definitive, especially given Dr. LaPerriere's experience, rank and responsibility in the Corps hierarchy, as well as his obvious intimate knowledge and understanding of the applicable regulations.

The Schmitts also claim that the *provisions* of 33 U.S.C. § 59*l exempts them from* complying with 33 U.S.C. § 403. (Schmitts' Post–Hearing Memorandum at pp. 16–17) 33 U.S.C. § 59*l* provides:

"The prohibitions and provisions for review and approval concerning wharves and piers in waters of the United States as set forth in sections 403 and 565 of this title shall not apply to any body of water located entirely within one State *which is, or could be, considered to be a navigable body of water of the United States solely on the basis of historical use in interstate commerce.*"

(33 U.S.C. § 59*l* [emphasis supplied]) There is no evidence in the record which indicates that the navigability of the water in and around the Schmitt Marina is "solely" based on "historical use." To the contrary, Dr. LaPerriere testified that these waters are currently navigable in fact (Tr. at pp. 66, 1027–29, 1093 and 1236), and as a result, 33 U.S.C. § 59*l* has no bearing on the instant application.

■ Finally, the Schmitts claim that the "grandfather" provisions of 33 U.S.C. § 403 protect and exempt their actions in constructing floating docks from compliance with the Rivers and Harbors Appropriation Act. (Schmitts' Post–Hearing Memorandum at pp. 18–20) In particular, 33 C.F.R. § 322.4(a) provides:

"[a]ctivities that were commenced or completed shoreward of established Fed-

eral harbor lines before May 27, 1970 ... do not require [§ 403] permits...."

While the photographic evidence indicates that the present floating docks were installed after May 27, 1970 (*compare* Plaintiff's Exhibit 4 [1976 photograph] and Plaintiff's Exhibit 3 [1984 photograph]), they argue that "the change in the type of 'obstruction' from moorings to docks is simply a minor deviation due to a change in materials." (Schmitts' Post–Hearing Memorandum at p. 20)

The Court rejects the Schmitts' alleged "grandfather" defense for two reasons. First, the Government put forth unrebutted testimony that harbor lines were abolished in the waters where the Schmitt Marina is located in 1951 (Tr. at pp. 1086–1087, 1249 and 1281–1282), and thus 33 C.F.R. § 322.4(a) is not implicated. In addition, the floating docks and walkway clearly were constructed after May 27, 1970. There is nothing in § 403's "grandfather" clause which indicates that such new construction, albeit replacing construction present prior to May 27, 1970, is exempt from § 403 compliance. In this Court's view, the "grandfather" clause at issue does not encompass obstructions which replace pre-existing structures.

In sum, the Government has clearly established the likelihood of success on the merits of its Rivers and Harbors Appropriation Act cause of action (§ 403) with regard to the docks, floating docks and the walkway located in the Schmitt Cove adjacent to the Schmitt Marina.

2. *Clean Water Act, 33 U.S.C. § 1344*

33 U.S.C. § 1344(a), § 404 of the Clean Water Act, provides:

"The Secretary may issue permits, after notice and opportunity for public hearings for the discharge of dredged or fill material into the navigable waters at specified disposal sites."

33 U.S.C. § 1311(a) states:

"Except as in compliance with ... sections ... 1344 of this title, the discharge of any pollutant by any person shall be unlawful."

In addition, 33 C.F.R. § 323.3(a) provides:

"Except as provided in § 323.4 of this Part, [Department of Army] permits will be required for the discharge of dredged or fill material into waters of the United States."

The Corps' jurisdiction under the Clean Water Act extends to the "spring high tide" line. (33 C.F.R. § 328.4[b]; *see United States v. Boccanfuso*, 882 F.2d 666, 668 [2d Cir.1989])

The evidence at the hearing is uncontroverted that the Schmitt Marina and the Schmitt Cove are within the "spring high tide." (Tr. at pp. 1037 and 1196) In addition, the Schmitts have not challenged the testimony that "fill material," in this case construction debris (Tr. at pp. 68–69), was dumped into the cove and that a riprap wall was built sometime in the mid 1970's (Tr. at pp. 456–57, 460–63, 487–88 and 1195–96) and a breakwall was built or expanded in 1984 (Tr. at pp. 1189–90). The Court was also impressed with the testimony of DEC Investigator Burke, who was candid, forthright and totally believable. Of significance in this preliminary injunction application is the fact that on November 19, 1984, defendant John Schmitt was given actual notice that he needed a DEC permit prior to filling in or altering the tidal marshes and the navigable water in the Schmitt Cove; advice he apparently ignored for a period of five years.

Moreover, the Schmitts do not challenge the fact that the fill material was discharged into the "waters of the United States." (*See* 33 C.F.R. §§ 323.2[a] and 328.3[a]) Given the testimony that Jamaica Bay is water currently used in interstate commerce (Tr. at p. 1029; *see* 33 C.F.R. § 328.3[a][1]) and given the testimony regarding the prevalence of marshland in and around the Schmitt Cove (Tr. at pp. 68–69 and 98–101; *see* 33 C.F.R. § 328.3[b]), the Court finds that the Government has demonstrated a likelihood of success of proving that fill material was discharged into the waters of the United States.

Finally, the Schmitts concede that they never applied for or received a Corps permit for the construction of the riprap breakwall in the tidal marsh area. (Tr. at p. 63)

The Schmitts' Post–Hearing Memorandum does not address the Clean Water Act cause of action. In fact, consistent with their Rule 68 Offer, in their Post–Hearing Memorandum the Schmitts state that "there is no objection to that portion of plaintiff's motion that seeks to enjoin or restrain" the Schmitts from " 'filling of tidal wetlands,' " although they deny that they have previously done so. (Schmitts' Post–Hearing Memorandum at p. 1)

Based on the unrefuted evidence the Court finds that the Government has demonstrated a likelihood of success on the merits on its Clean Water Act cause of action. (*Accord United States v. Ciampitti,* 583 F.Supp. 483, 492 [D.N.J.1984] [court issued preliminary injunction enjoining defendants from violating the Clean Water Act where at hearing the Government presented "strong" evidence that [1] "fill" material was being discharged by the defendants, [2] no defendants applied for a permit, and [3] the land in question retained all the essential characteristics of "wetlands"])

### 3. *Trespass*

Mindful that the instant application is one for a preliminary injunction and is made prior to the completion of discovery in this case, the Court declines to make any adjudication with respect to the Government's trespass cause of action. The question of who has title to the Schmitt Marina land is one which would involve discovery of the deeds, leases and conveyances dating back approximately fifty years. More importantly, in this application for preliminary relief, whether or not the Schmitts possess title to the land underneath the Schmitt Marina, by way of deed, adverse possession or otherwise, in no way implicates the Court's finding that the Government has demonstrated that there is a likelihood that the Schmitts violated both the Rivers and Harbors Appropriation Act and

the Clean Water Act. Simply put, even if the Schmitts hold title to the land under their marina in fee simple, such a property right would not exempt the Schmitts from complying with the Rivers and Harbors Appropriation Act and the Clean Water Act.

For these reasons, the Court declines to address the portion of the Government's application for a preliminary injunction based on the cause of action of trespass.

### B. *Irreparable Harm*

The Government contends that "[w]here an injunction is authorized by statute, and the statutory conditions are met, the agency to whom the enforcement of the right has been entrusted is not required to show irreparable injury." (Government's Memorandum of Law in Support at p. 11; Government's Post–Hearing Memorandum at p. 20)

Specifically, the Government argues that 33 U.S.C. § 406 expressly authorizes the Attorney General to enforce the Rivers and Harbors Appropriation Act by injunction from the district court. (Government's Memorandum in Support at p. 10) As to the Clean Water Act, the Government takes the position that irreparable harm is presumed because 33 U.S.C. § 1344(s)(3) provides for enforcement of Clean Water Act violations by way of injunctive relief. (Government Post–Hearing Memorandum at p. 10 and Government's Proposed Conclusions of Law at p. 15) The Government concludes that:

> "By enacting the Clean Water Act, the Bridges and Harbors Act and the Gateway Act, Congress determined that (1) an obstruction to navigation constitutes irreparable harm, (2) dumping debris, fill, petroleum products and solvents into the Big Egg Marsh is irreparable harm, and (3) destroying the remnant tidal wetland of Jamaica Bay is also irreparable harm." (Government Reply Memorandum at p. 5)

In response, the Schmitts contend that Second Circuit authority, *i.e. Sonesta International Hotels Corp. v. Wellington Associates,* 483 F.2d 247, 250 (2d Cir.1973),

requires a showing of irreparable harm before a preliminary injunction can be issued. (Schmitt Memorandum of Law at p. 4).

■■■ Upon a review of the relevant authority, the Court finds that irreparable harm is presumed when the Government seeks a preliminary injunction pursuant to a statute which expressly authorizes entry of an injunction upon a showing of a violation of law by the Government. Since 33 U.S.C. § 406 expressly authorizes the entry of an injunction for a violation of the Rivers and Harbors Appropriation Act proven by the Attorney General, the Government is not required to demonstrate irreparable harm in order for a preliminary injunction to issue. However, 33 U.S.C. § 1344(s)(3) does not expressly authorize the entry of an injunction for a violation of the Clean Water Act as alleged in the complaint and the Government must demonstrate irreparable harm in order for an injunction to issue with respect to its Clean Water Act claim.

### 1. The Legal Standard

Where Congress expressly provides for Government enforcement of a statute by way of injunction, and the Government has satisfied the statutory conditions of the statute, irreparable harm to the public is presumed. For example, in *Securities and Exchange Commission v. Management Dynamics, Inc.*, 515 F.2d 801 (2d Cir.1975), the Securities and Exchange Commission (the "SEC") brought an action to permanently enjoin eighteen defendants from violating the anti-fraud provisions of the Securities Act of 1933 and of the Securities and Exchange Act of 1934. Certain defendants appealed the entry of preliminary injunctions against them and argued that the district court applied the incorrect legal standard in granting the preliminary injunction. The district court had held that SEC injunction actions, unlike those in suits between private parties, do not require either a finding of irreparable harm or a balancing of the equities favoring the SEC. (515 F.2d at p. 806)

The Second Circuit in *Management Dynamics* first noted that the district court found "that the violations were conclusively demonstrated" and that the district court "was aware of, and based its decision on," the legal principle that an SEC enforcement injunction should be issued only upon a showing that "'there is a reasonable likelihood that the wrong will be repeated.'" (*Id.* at p. 807 [citations omitted]) The court then held as follows:

"Accordingly, appellants' contention on this point stands or falls with its claim that preliminary injunctive cannot be granted at the SEC's behest unless a district court finds irreparable injury or a balance of equities which favor the Commission. The appellants' crucial error on this score is their assumption that SEC enforcement actions seeking injunctions are governed by criteria identical to those which apply in private injunction suits. *Unlike private actions, which are rooted wholly in the equity jurisdiction of the federal court, SEC suits for injunctions are 'creatures of statute.' '[P]roof of irreparable injury or the inadequacy of other remedies as in the usual suit for injunction' is not required.*

\*  \*  \*  \*  \*  \*

We scarcely mean to imply that judges are free to set to one side all notions of fairness because it is the SEC, rather than a private litigant, which has stepped into court.... But the statutory imprimatur given SEC enforcement proceedings is sufficient to obviate the need for a finding of irreparable injury at least where the statutory prerequisite—the likelihood of future violations of the securities laws—has been clearly demonstrated.

The rationale for this rule is readily apparent.... [B]y making the showing required by statute that the defendant 'is engaged or about to be engage' in illegal acts, *the Commission is seeking to protect the public interest, and 'the standards of the public interest not the requirements of private litigation measure the propriety and need for injunctive relief.'*" (*Id.* at p. 808 [citations omitted] [emphasis supplied])

(*Accord Walling v. Brooklyn Braid Co.*, 152 F.2d 938, 941 [2d Cir.1945] [in an action to enforce provisions of the Fair Labor Standards Act, court held "[t]he trial court is not bound by the strict requirements of traditional equity as developed in private litigation but in deciding whether or not to grant an injunction in this type of case should also consider whether the injunction is reasonably required as an aid in the administration of the statute, to the end that the Congressional purposes underlying its enforcement shall not be thwarted"]; *United States v. Diapulse Corp.*, 457 F.2d 25, 27–28 [2d Cir.1972] [citations omitted] [in action to enforce provisions of the Food, Drug and Cosmetic Act, court held that "the function of a court in deciding whether to issue an injunction authorized by a statute of the United States to enforce and implement Congressional policy is a different one from that of the court when weighing claims of two private litigants ... the legislative goals are the framework within which the court operates in deciding whether to grant injunctive relief ... [n]o specific or immediate showing of the precise way in which violation of the law will result in public harm is required"])

Similarly, in *United States v. Odessa Union Warehouse Coop.*, 833 F.2d 172 (9th Cir.1987), the United States sought to preliminarily enjoin the sale and movement of wheat undertaken by the defendant in violation of the Food, Drug, and Cosmetic Act (the "FDCA"). Section 302(a) of the FDCA provides that "[t]he district courts of the United States ... shall have jurisdiction, for cause shown ... to restrain violations of section 331 of this title." 21 U.S.C. § 332(a). The district court had denied the Government's motion for a preliminary injunction, holding that "[f]ederal judges being an independent group, this Court has developed its own list of conditions and feels that a preliminary injunction should issue only when the circumstances truly permit no other course, when the crisis is current or at least appears to be recurrent, that the response of the respondent is recalcitrant and clearly so ..." (833 F.2d at p. 175) In finding the district court's stan-

dard "far too restrictive," the Ninth Circuit held:

> "[w]here an injunction is authorized by statute, and the statutory conditions are satisfied as in the facts presented here, the agency to whom the enforcement of the right has been entrusted is not required to show irreparable injury.... The district court accordingly should have presumed that the government would suffer irreparable injury from a denial of its motion." (*Id.* at pp. 175–176 [citations omitted])

Finally, whether the Government needs to show irreparable harm in order for a preliminary injunction to issue upon a showing of a Rivers and Harbors Appropriation Act violation was alluded to in *Stoeco Homes*, *supra*. In *Stoeco Homes*, the defendant appealed from the entry of a permanent injunction entered against it in the district court for, *inter alia*, violating the Rivers and Harbors Act by "dredging and bulkheading lagoons and pumping the dredged materials to adjoining uplands" without a permit. (498 F.2d at pp. 600–602) Having already found that the district court erred in granting a permanent injunction under 33 U.S.C. § 403, the court stated in dicta that "[n]o balancing of interest or need to show irreparable injury is required when an injunction is sought under § [406] to prevent erection or seek removal of an unlawful structure; a remedy we have found to be inapplicable" (*Id.* at p. 611)

The authority cited by the Schmitts to support their contention that the Government must demonstrate irreparable harm before a preliminary injunction can be issued, even where a statute expressly provides for government enforcement by way of injunction, is unpersuasive.

In particular, the Schmitts point to *State of New York v. Nuclear Regulatory Commission*, 550 F.2d 745 (2d Cir.1977), a suit brought by New York State to preliminarily enjoin certain federal agencies, including the Nuclear Regulatory Commission, from transporting by air nuclear materials until and unless those agencies compile an Environmental Impact Statement in accordance with the National Environmental Policy

Act ("NEPA"), 42 U.S.C. § 4332(2)(C). In reviewing the district court's denial of a preliminary injunction, the Second Circuit held that a violation of NEPA does not constitute *per se* irreparable harm:

> "the language of the second prong of the *Sonesta* test does not eliminate the basic obligation of the plaintiff to make a clear showing of the threat of irreparable harm. That is a fundamental and traditional requirement of all preliminary injunctive relief..... In sum, the balance of the hardships test of *Sonesta* necessarily includes the showing of irreparable harm." (550 F.2d at 750, 753)

*Nuclear Regulatory Commission* clearly was not an action brought *by* the United States, or an agency thereof, to enforce an environmental statute containing express provisions for injunctive relief in suits brought by the Attorney General of the United States, and thus is inapplicable to the instant enforcement action brought by the Government.

In addition, the Schmitts cite to two other cases—*United States v. Kentland–Elkhorn Coal Corp.*, 353 F.Supp. 451 (E.D.Ky. 1973) and *United States v. Lambert*, 695 F.2d 536 (11th Cir.1983)—in support of their contention that the Government must demonstrate irreparable harm. The Court is not inclined to follow *Kentland–Elkhorn*, a 1973 Eastern District of Kentucky case, in light of the Second Circuit's 1975 holding in *Management Dynamics*. Indeed, the court in *Kentland–Elkhorn* itself recognized the presence of authority contrary to its own holding. (353 F.Supp. at p. 455)

In *United States v. Lambert, supra*, the Government sought to preliminarily enjoin the defendants form "further construction, filling, or discharging pollutants into the wetlands adjacent to the Banana River without a permit from the United States Army Corps of Engineers" in violation of the Clean Water Act. (695 F.2d at p. 538) The defendants were using a tract of wetland as a disposal cite for the shells of scallops processed by the defendants' seafood company. After an evidentiary hearing, the district court denied the Government's application for a preliminary injunction, finding that despite its probable showing of a Clean Water Act violation, the Government failed to demonstrate irreparable harm in that they did not show that any alleged damages "could not be remedied by a permanent injunction or a civil fine or both." (*Id.* at p. 539) In reviewing the district court's finding, the eleventh circuit court held as follows:

> "A review of the record reveals that although the district court might have issued an injunction, a denial was clearly within its discretion. The Government has fallen short of carrying its burden of showing the second factor ... to compel an injunction as a matter of law, *i.e.*, that irreparable harm is likely if an injunction is not granted. Environmental litigation is not exempt from this requirement.... The Government's success in establishing a likelihood it will prevail on the merits does not obviate the necessity to show irreparable harm." (*Id.* at p. 540)

*Lambert* was a proceeding brought to enforce provisions of the Clean Water Act. As discussed *infra*, the Court finds that the Government must demonstrate irreparable harm in order for a preliminary injunction to issue upon a showing of a likelihood of success of a Clean Water Act violation. Nothing in the *Lambert* case indicates that the Eleventh Circuit would require the Government to demonstrate irreparable harm in an enforcement proceeding brought pursuant to 33 U.S.C. § 406. As a result, the ruling in *Lambert* is not inconsistent with the Court's findings in the instant case.

Finally, the Court is mindful of the recent Second Circuit opinion in *Town of Huntington v. Marsh, et al.*, 884 F.2d 648 (2d Cir.1989), *cert. denied sub nom.*, —— U.S. ——, 110 S.Ct. 1296, 108 L.Ed.2d 473 (1990). In *Town of Huntington*, the district court found that the defendants violated the Ocean Dumping Act and that the Environmental Impact Statement submitted by defendant Army Corps of Engineers (the "Corps") pursuant to NEPA was inadequate. As a result, the district court issued a preliminary injunction enjoining

the Corps and the other defendants "from dumping dredged materials, or issuing permits to dump dredged materials" at a disposal sight in Long Island Sound off Huntington, New York. (884 F.2d at p. 649) The district court imposed the injunction "without holding an evidentiary hearing, finding that '[t]he public has an interest in maintaining the physical, chemical and biological balance at the dump site that outweighs the private interest,' which the district court described as 'inconvenience and additional cost to owners of docks and piers.'" (*Id.*)

The Second Circuit vacated the injunction, reasoning as follows:

"provision is made for injunctive relief in the Ocean Dumping Act, 33 U.S.C. § 1415(g)(1) ... [and] injunctive relief has been used when appropriate for violations of NEPA ... however ... injunctive relief does not follow automatically upon a finding of statutory violations, including environmental violations." (*Id.* at p. 651)

Citing the holding in *Nuclear Regulatory Commission* that a NEPA violation does not constitute *per se* irreparable harm, the Court held that "a threat of irreparable injury must be proved, not assumed, and may not be postulate *eo ipso* on the basis of procedural violations of NEPA." (*Id.* at p. 653)

Upon review of the precedents and for the reasons discussed above, the Court finds that irreparable harm is presumed where the Government seeks to enforce a statutory violation by way of preliminary injunction expressly authorized in favor of the Government by that statute (*Management Dynamics*, 515 F.2d at p. 808). For example, 33 U.S.C. § 406 expressly provides for injunctive relief in actions brought by the Attorney General of the United States. In contrast, *Town of Huntington*, like *Nuclear Regulatory Commission*, was an action brought by a municipality pursuant to private rights of action set forth in NEPA and the Ocean Dumping Act, not by the United States as in the instant case. (*See Town of Huntington*, 884 F.2d at p. 651 [court cites to the injunc-

tion provision in the Ocean Dumping Act entitled "Civil suits by private persons," 33 U.S.C. § 1415(g), and not to 33 U.S.C. § 1415(d) of the Ocean Dumping Act which, like 33 U.S.C. § 406, empowers the Attorney General of the United States to enforce the statute by way of injunctive relief])

### 2. *The Rivers and Harbors Appropriation Act Claim*

The Rivers and Harbors Appropriation Act expressly authorizes the Government to enforce the statute, and empowers the district court to remedy, § 403 violations by way of injunction. Section 406 of the Rivers and Harbors Act states:

"Every person and every corporation that shall violate any of the provisions of sections 401, 403 and 404 of this title ... shall be deemed guilty of a misdemeanor ... And further, the removal of any structures or parts of structures erected in violation of the provisions of the said sections *may be enforced by the injunction of any district court* in which such structures may exist, and proper proceedings to this end may be *instituted under the direction of the Attorney General of the United States*." (33 U.S.C. § 406 [emphasis supplied])

In *Management Dynamics, supra,* the Second Circuit stated that in the context of a preliminary injunction application by the Government pursuant to federal statute irreparable harm is presumed:

"[u]nlike private actions, which are rooted wholly in the equity jurisdiction of the federal court, SEC suits for injunctions are 'creatures of statute.' '[P]roof of irreparable injury or the inadequacy of other remedies as in the usual suit for injunction' is not required." (515 F.2d at p. 808 [citations omitted])

The SEC enforcement provisions referred to by the Court in *Management Dynamics* are in fact similar to 33 U.S.C. § 406. In particular, 15 U.S.C. § 78u(d) provides that:

"Whenever it shall appear to the Commission that any person is engaged or is about to engage in acts or practices constituting a violation of any provision of this chapter ... it may in its discretion

bring an action in the proper district court of the United States ... to enjoin such acts or practices, and upon a proper showing a permanent or temporary injunction or restraining order shall be granted without bond."

Section 406 provides a similar enforcement mechanism, in that the remedy of injunctive relief is expressly provided for in actions to remove structures present in violation of 33 U.S.C. § 403. The instant action is brought by the United States seeking injunctive relief as explicitly authorized by 33 U.S.C. § 406. As a result, irreparable harm need not be shown in order for a preliminary injunction to be issued with respect to the government's Rivers and Harbors Appropriation Act cause of action. (*Accord United States v. Alleyene*, 454 F.Supp. 1164, 1170 [S.D.N.Y.1978] ["the United States need not show irreparable injury to obtain injunctive relief under 33 U.S.C. Sections 403 and 406"]; *Ciampitti, supra*, 583 F.Supp. at p. 498 ["[i]t is clear that the government need not make a showing of 'irreparable injury' in order to qualify for an injunction under the Rivers and Harbors Act"])

Even if the Government was required to demonstrate irreparable harm in order for a preliminary injunction to issue with respect to its Rivers and Harbors Appropriation Act claim, the Government clearly has proven irreparable injury. Dr. Tanacredi testified at length on the diverse ecology in the Schmitt Cove and the detrimental effect the operation of the Schmitt Marina has on that ecology. (Tr. at pp. 356–357) In addition, Dr. LaPerriere testified that the docking of boats at the Schmitt Marina will cause habitat elimination and abnormal cell growths in certain marine organisms (Tr. at pp. 76, 85 and 95–101) and that "the specific impacts associated with development ... associated with marsh areas and estuarine areas is the loss of habitat, the dredging of that habitat, and also the potential flooding and changes and alterations to the flow of tidal waters in the coastline" (Tr. at p. 98). The docking of boats at the obstructions placed in navigable waters by the Schmitts in violation of 33 U.S.C. § 403—namely the floating docks, moorings and walkways—would irreparably harm the environment in and around the Schmitt Cove.

### 3. *The Clean Water Act Claim*

With respect to the Government's Clean Water Act claim, Congress has not expressly provided for injunctive relief for the violation alleged by the Government in this action. As a result, the Government must demonstrate the element of irreparable harm with regard to this claim in order to be entitled to the remedy of a preliminary injunction.

The Government charges that the Schmitts have "caused the discharge of fill material into navigable waterways in Broad Channel, New York, in violation of U.S.C. §§ 403 and 1344." (Complaint at ¶ 26) The Government points to § 1344(s)(3) as authority for this Court to issue a preliminary injunction in favor of the Government without a showing of irreparable harm. (Post–Hearing Memorandum at p. 10) 33 U.S.C. § 1344(s)(3) provides:

"The Secretary [of the Army] is authorized to commence a civil action for appropriate relief, including a permanent or temporary injunction for any violation in which he is authorized to issue a compliance order under paragraph (1) of this subsection. Any action under this paragraph may be brought in the district court of the United States for the district in which the defendant is located or resides or is doing business, and such court shall have jurisdiction to retain such violation and to require compliance."

However, § 1344(s)(3) by its terms applies only to § 1344(s)(1) violations, which concern violations of "any conditions or limitation set forth in a permit issued by the Secretary [of the Army]...." Neither the complaint nor the Order To Show Cause allege that the Schmitts' violated conditions set forth in *permits* issued by the Secretary of the Army. To the contrary, the basis for the Government's Clean Water Act claim is that the Schmitts dumped fill into navigable waters without a permit. (Complaint at ¶ 26)

Section 1344(s)(3) does not expressly empower the district court to grant an injunction upon a finding that the Schmitts discharged fill material into navigable waterways without a permit from the Corps. As a result, having shown a likelihood of success on the merits of its Clean Water Act claim, the Government (*see Town of Huntington*, 884 F.2d at p. 654) must demonstrate irreparable harm in order for an injunction to be issued under the Clean Water Act. (*Accord Stoeco, supra*, 498 F.2d at p. 611)

The Court finds that the Government has sustained the burden of demonstrating irreparable harm with regard to the Clean Water Act claim. The testimony at the hearing clearly indicated that the damage caused to the marsh and waters as a result of the construction of the riprap wall could not be compensated for in monetary damages and is irreparable.

The aerial photographs (plaintiff's Exhibits 3, 4, 17 and 23) illustrate that ten acres of marshland have been filled in the Schmitt Cove. In addition, Dr. LaPerriere testified that the unfilled portion of the Schmitt Cove—a salt marsh area regularly inundated by tidal waters—had lost all of the vegetation and smooth green grass present in the 1960's. (Tr. at pp. 1041–46; *compare* Defendants' Exhibit W [1960's] with Plaintiff's Exhibit 3 [1984]) Dr. LaPerriere also testified that the marsh islands in and around the Schmitt Cove supply the primary organisms for "food of invertebrate species, fish and birds" and that the long-term effect of the destruction of the marshes, especially pronounced in a small area marsh as in the Schmitt Cove, "is a loss of the wildlife and flora habitat." (Tr. at pp. 76, 85 and 95–98) Clearly money damages cannot compensate the citizens of the United States for the loss of vegetation and marshland in the Schmitt Cove.

The Court finds that this destruction of the marsh land and the ecological harm to the environment is irreparable, and, absent preliminary injunctive relief, will continue to cause irreparable harm. (*Accord United States v. Malibu Beach, Inc.*, 711 F.Supp. 1301, 1312–13 [D.N.J.1989] [where Government established that property at issue provides habitat for wildlife and feeding and nesting for migratory birds, court held that "there is no adequate remedy at law to compensate the public for the harm caused by the disposal of fill material into waters of the United States or in wetlands"])

## C. *Defenses*

In their answer and during the course of the hearing the Schmitts asserted certain defenses to the Government's application for a preliminary injunction. For the reasons discussed below, the Court finds the Schmitts' defenses without merit.

### 1. *Equitable Estoppel*

The Schmitts raise the defense of equitable estoppel (Answer, Sixth Affirmative Defense) in conjunction with their assertion that the Government has not demonstrated that irreparable harm would result if a preliminary injunction is not issued. In particular, the Schmitts argue that:

"[t]he Schmitt Marina has operated at the same location for more than forty-five (45) years. Plaintiff, through the Gateway National Recreation Area, has been present in the area since 1972. At all times, Plaintiff has known of the operations of the Schmitt Marina. During those nearly eighteen (18) years, Plaintiff has failed to act. There is simply no factual basis to conclude that any harm (even if some should exist, which Defendants deny) is irreparable.

Given the length of time that Plaintiff has known about the operations of the Schmitt Marina, equity dictates that it should be estopped from asserting that there is any presumption that the harm flowing from those operations is irreparable and immediate." (Supplemental Post–Hearing Memorandum at pp. 5–6)

The Schmitts also allege that "estoppel theories can be applied against the United States, under certain circumstances," and that "[i]n seeking *preliminary* injunctive relief, which is equitable in nature, the Government should not be permitted to cloak itself with immunity from its own

inaction over an extended period of time." (*Id.* at p. 6 [emphasis in original])

The principle of equitable estoppel is not applied against the Government in the same manner as it is applicable to a private litigant. (*Heckler v. Community Health Services*, 467 U.S. 51, 60, 104 S.Ct. 2218, 2224, 81 L.Ed.2d 42 [1984] ["[w]hen the Government is unable to enforce the law because the conduct of its agent has given rise to an estoppel, the interest of the citizenry as a whole in obedience to the rule of law is undermined"]) Moreover, the Court in *Community Health Services* also stated that "[p]etitioner urges us to expand this principle into a flat rule that estoppel may not in any circumstances run against the Government.... Though the arguments the Government advances for the rule are substantial, we are hesitant, when it is unnecessary to decide this case, to say that there are *no cases* in which the public interest in ensuring that the Government can enforce the law free from estoppel might be outweighed by the countervailing interests of citizens in some minimum standard of decency, honor, and reliability in their dealings with the Government." (467 U.S. at pp. 60–61, 104 S.Ct. at p. 2224)

Thus, in only very "limited and unusual circumstances" can the United States be estopped from enforcing the law. (*Boccanfuso*, 882 F.2d at p. 670) The defense can be interposed against the Government only upon a showing that the Government made a misrepresentation which the party reasonably and detrimentally relied on and that there was affirmative misconduct on the part of the Government. (*Corniel–Rodriguez v. Immigration & Naturalization Service*, 532 F.2d 301, 306 [2d Cir. 1976]) The Supreme Court has warned that if the party asserting estoppel "had knowledge of the truth, or had means by which with reasonable diligence he could acquire the knowledge so that it would be negligence on his part to remain ignorant by not using those means, he cannot claim to have been misled by relying on the representation ..." (*Community Health Services*, 467 U.S. at pp. 59–60, n[10], 104 S.Ct. at pp. 2223–24, n[10] [1984]) (*See McCracken v. United States*, 502 F.Supp.

561, 571 [D.Conn.1980] [citations omitted] [court denied estoppel defense and held that "[u]nlike the plaintiff in *Corniel–Rodriguez,* who was 'a naive and poorly educated alien,' ... the petitioner here is a high school graduate who impressed the court during his testimony as an articulate and intelligent young man"])

The Second Circuit recently addressed the estoppel issue in the context of an action to enforce the provisions of the Rivers and Harbors Appropriation Act and the Clean Water Act in *United States v. Boccanfuso, supra.* In *Boccanfuso,* the Government brought an action against a landowner to remove seawalls he had built in violation of the Clean Water Act. The district court held that the Government was estopped from asserting its Clean Water Act claim because it had (1) affirmatively misrepresented to the defendant that his seawall would be in compliance with the Clean Water Act if it was built at a point above the mean high water line and (2) delayed in asserting jurisdiction over the proposed seawall despite the defendant writing to the Corps informing them of his proposed seawall. (*United States v. Boccanfuso,* 695 F.Supp. 693, 696 and 699 [D.Conn.1988])

The Second Circuit reversed, reasoning that "[t]he record here shows that throughout the course of dealings between the Corps and [the defendant], information as to the Corps' jurisdiction was readily available to [the defendant]" and to the defendant's architect. (882 F.2d at p. 670) Significantly, the Second Circuit disagreed with the district court's finding that the Corps' silence in response to the defendant's letter estopped the Government:

"The Corps cannot be estopped from enforcing the Act on the ground that it failed to follow the deadlines established by its own regulations. The district court overlooked the distinction between statutorily mandated deadlines and those imposed by the agency's own regulations. Federal agencies do not lose jurisdiction by their failure to comply with statutory time limits unless the statute demonstrates congressional intent that

this result occur ... and the Court is reluctant to void subsequent agency action when an agency has failed to observe a procedural requirement but important public rights are at stake and less drastic remedies are available...." (882 F.2d at p. 671 [citations omitted])

The court concluded that the "less drastic remedy" available to the defendant was that he "could have brought an action in the district court for judicial review of the Corps' failure timely to process his section 404 permit application. As the Government argues, [the defendant] should not be permitted to circumvent the [Administrative Procedure Act] and then raise the defense of estoppel." (Id. at p. 672)

■ The evidence in the instant record falls far short of the proof necessary for this Court to find that the Government is estopped from enforcing its Rivers and Harbors Appropriation Act and Clean Water Act claims. The one alleged instance of a representation by a government employee which the Schmitts relied on—the 1989 telephone conversation Adam Schmitt testified he had with Ms. Nagi—came four years after Mr. Burke, a DEC enforcement officer, personally warned Mr. John Schmitt of the need to obtain a permit.

The Court doubts the veracity of John Schmitt's testimony as to a government representation through a telephone conversation with a clerical employee without any attempt by Mr. Schmitt to memorialize in writing, or follow up in any manner, such a significant representation. Moreover, at the time of the conversation with Ms. Nagi the Schmitts had already built the floating docks and the walkway in their entirety. (See, e.g. Plaintiff's Exhibit 3 [the 1984 photograph]) In Boccanfuso, the Government's failure to respond to written statements by the defendant setting forth his basis as to why he was not required to obtain a permit pursuant to 33 U.S.C. § 1344 as well as the defendant's testimony that a Corps official (mistakenly) informed him that the Corps had jurisdiction only up to the mean high tide line and not up to the spring high tide line under the Clean Water Act, all prior to the defen-

dant's construction of the seawall at issue in that case, was held insufficient by the Second Circuit to estop the Government from enforcing the provisions of § 1344. In this case, the alleged misrepresentation by the Government occurred after the Schmitts built the obstructions at issue. Thus, the Schmitts did not detrimentally rely on Ms. Nagi's statement with regard to the construction of the floating docks, walkway or riprap walls.

Also, there is no evidence in this record of "affirmative misconduct" on the part of the Government. (Corniel-Rodriguez, 532 F.2d at p. 306; accord Southern Investment Co., supra, 876 F.2d at p. 614) As a result, the Government cannot be estopped from prosecuting its Rivers and Harbors Appropriation Act and Clean Water Act claims.

### 2. Laches

■ Although not raised in their posthearing submission, the Schmitts raised in their answer (Fourth Affirmative Defense) and during the course of the hearing (Tr. at p. 1007) the doctrine of laches as a bar to the instant proceeding. However, the defense of laches cannot be applied as a defense to the United States when enforcing its rights. (See United States v. Summerlin, 310 U.S. 414, 416, 60 S.Ct. 1019, 1020, 84 L.Ed. 1283 [1940] ["[i]t is well settled that the United States is not bound by state statutes of limitation or subject to the defense of laches in enforcing its rights"]; Costello v. United States, 365 U.S. 265, 281, 81 S.Ct. 534, 542, 5 L.Ed.2d 551 [1961] ["delay which might support a defense of laches in ordinary equitable proceedings between private litigants will not bar a denaturalization proceeding brought by the Government"]; United States v. Arrow Transportation Co., 658 F.2d 392, 394 [5th Cir.1981], cert. denied, 456 U.S. 915, 102 S.Ct. 1769, 72 L.Ed.2d 174 [1982] [in suit brought under the Rivers and Harbors Act, court held that "[a]lthough the fact situation describes a textbook case of laches, that defense cannot be asserted against the United States in its sovereign capacity to enforce a public right or to protect the public interest"]; see also Weiszmann, su-

*pra* [court held that even if laches could be asserted against the United States it was not a defense to the requirement that plaintiff obtain a permit to dredge a canal on his property, where the Army Corps of Engineers failed to respond to letters sent by plaintiff which argued that the Rivers and Harbors Act did not provide federal jurisdiction over the canal])

Therefore, the doctrine of laches is unavailable as a defense in this case.

### 3. *Selective Enforcement*

The Schmitts' Fourteenth Affirmative Defense is as follows:

"Plaintiff's action is barred in that it constitutes selective enforcement of the law by the Plaintiff, which upon information and belief has failed to proceed to act similarly against all competitors of the Defendants operating in a like manner on the waters of Jamaica Bay and thus by proceeding herein in causing irreparable harm to the Defendants to the benefit of their competitors."

Throughout the hearing counsel for the Schmitts made reference to the above-quoted affirmative defense (*see, e.g.,* Tr. at p. 210), and the Court repeatedly invited the Schmitts' counsel to submit law in support of their claim that the Government is precluded from enforcing the provisions of the Rivers and Harbors Appropriation Act and the Clean Water Act by reason of their "selective" enforcement of those statutes (*see, e.g.,* Tr. at pp. 334, 1005 and 1019).

■ The Schmitts have failed to cite any authority which supports such a defense in this case, and, in this Court's view, this defense is without merit. In *Alleyene, supra,* the district court held that to sustain a defense of selective enforcement under the Rivers and Harbors Appropriation Act and/or under the Clean Water Act, the defendant "must establish not only that plaintiff has proceeded against him and not others similarly situated, but also that he was selected as an enforcement target for constitutionally impermissible reasons," *i.e.* race. (454 F.Supp. at p. 1174 [citing *United States v. Berrios,* 501 F.2d 1207, 1211

[2d Cir.1974]]) The Schmitts have made no such showing in the instant case.

### CONCLUSION

The application of the plaintiff United States of America for a preliminary injunction is granted to the following extent:

(1) the defendants John Schmitt, Adam Schmitt d/b/a Channel Marine Suzucki and Schmitt's Marina, and Adam Schmitt d/b/a Adams Fishing Station are hereby preliminarily enjoined from placing or allowing the docking or storage of boats in the Schmitt Cove (*see* Plaintiff's Exhibit 3) until further Order of this Court; and

(2) the defendants John Schmitt, Adam Schmitt d/b/a Channel Marine Suzucki and Schmitt's Marina, and Adam Schmitt d/b/a Adams Fishing Station are hereby preliminarily enjoined from any further expansion of the Schmitt Marina into the Schmitt Cove or any portion of Jamaica Bay until further Order of this Court.

The parties are directed to appear before the Court on April 20, 1990 at 9:00 a.m. for a status conference.

SO ORDERED.